Oral Argument Not Yet Scheduled

No. 25-5067

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

**EMERGENCY MOTION FOR A STAY PENDING APPEAL**

YAAKOV M. ROTH
Acting Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

CHRISTINA P. GREER
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20530
Phone: (202) 598-8770
e-Mail: Christina.P.Greer@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

## INTRODUCTION

On March 15, 2025, without hearing from the United States and relying on speculation about future Presidential action, a District Court lacking jurisdiction purported to halt the potential removal of individuals associated with a designated foreign terrorist organization ("FTO") and is setting the stage to potentially inject itself into all such removals nationwide at a hearing scheduled for 5:00 p.m. today. A stay pending appeal is manifestly warranted, as is an immediate administrative stay.

The district court immediately enjoined removal of five anonymous plaintiffs who believe they will be wrongly identified as members of the FTO Tren de Argua ("TdA") and imminently removed. This Court should halt this massive, unauthorized imposition on the Executive's authority to remove dangerous aliens who pose threats to the American people. That order is immediately appealable because it commands the Executive Branch not to immediately remove plaintiffs, no matter whether the Executive Branch has identified compelling core national security and foreign policy objectives requiring removal.

Further underscoring the impropriety of this auto-TRO, Plaintiffs would not be irreparably injured by potential removal, as the Supreme Court has expressly held. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court acted without any jurisdiction—these claims sound in habeas. *See*, *e.g.*, *Ludecke v. Watkins* 335 U.S.

1

160 (1948) (considering challenge to action under Aliens Enemies Act as habeas claim). Yet the plaintiffs are being held in Texas, not in the District of Columbia. *See Rumsfeld v. Padilla*, 542 U.S. 425, 435 (2004). The alleged Presidential actions at issue here, if taken, would not be subject to review and would be lawful. If this TRO were allowed to stand, district courts would have license to enjoin virtually any urgent national-security action just upon receipt of a complaint. District courts might next TRO drone strikes, sensitive intelligence operations, or terrorist captures or extraditions. This Court should halt that path in its tracks.

## BACKGROUND

Plaintiffs allege that the President will soon invoke the Alien Enemies Act ("AEA"), 50 U.S.C. § 21 *et seq.*, to facilitate the removal of members of the notorious gang and designated FTO, TdA. Complaint, Dkt. 1, ¶ 45 ("Compl."). They allege that the President, in his Proclamation, will determine that TdA is linked to Venezuela and is itself a foreign nation or government that is "perpetrating, attempting, and threatening predatory incursions, hostile actions, and irregular warfare." *Id.* at ¶ 46. They further allege that the Proclamation will "state that all Venezuelan citizens ages fourteen or older alleged to be members of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies." *Id.* at ¶ 47.

2

On March 15, 2025, five individual plaintiffs who are nationals of Venezuela and claim to fear removal under the alleged Proclamation filed a class action complaint and petition for habeas with the U.S. District Court for the District of Columbia along with a motion for TRO. *See generally* Compl.; Dkt. 3 (motion for TRO). Hours later, without hearing from the Government, the district court granted Plaintiffs' TRO motion "to maintain the status quo until a hearing can be set," ordered that "Defendants shall not remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court," and set a hearing for March 17, 2025, at 4:00 pm. First Minute Order dated Mar. 15, 2025. A short time later the court set a hearing on Plaintiffs' motion for class certification for March 15, 2025, at 5:00 p.m. Second Minute Order dated Mar. 15, 2025. And just after that, the Government filed a notice of appeal of the court's order granting Plaintiffs' TRO motion.

## ARGUMENT

### I.     The TRO Is an Appealable Order.

This Court has jurisdiction to review the district court's order. Although TROs are ordinarily not appealable, they are appealable where they are "more akin to preliminary injunctive relief." *Garza v. Hargan*, 2017 WL 9854552, at *1 n.1 (D.C. Cir. Oct. 20, 2017), *vacated in part on reh'g en banc*, 874 F.3d 735 (D.C. Cir. 2017), *vacated sub nom. Azar v. Garza*, 584 U.S. 726 (2018); *see Belbacha v. Bush*, 520

F.3d 452, 455 (D.C. Cir. 2008) (treating denial of temporary restraining order as "'tantamount to denial of a preliminary injunction'").[1] That is true here for two reasons.

*First*, to the extent the district court order purports to halt a potential invocation of the AEA, it works an extraordinary harm to the President's authority to declare an invasion of the United States and his inherent Article II authority to repel such an invasion and conduct foreign affairs. Federal courts have consistently held that the determination by the Executive of whether there is an "invasion" is a nonjusticiable political question, *see, e.g.*, *State of California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases), and as the Supreme Court has long recognized, federal courts have no authority to issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."). The discretion afforded the President in this context, and the court's lack of authority to hinder the exercise of that discretion, is especially plain under the AEA: "[t]he authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint

---

[1] Although a party must ordinarily first seek a stay pending appeal by the district court under Fed. R. Appellate Procedure 8(a)(1), the importance of the issues involved as discussed in this motion as well as the fast-moving nature of this case warrant this Court's intervention.

4

to which they (alien enemies) shall be subject, and in what cases,' is, of course, plenary and not reviewable." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919). This Court has identified the significance of the harm that a TRO poses to the Executive Branch as a relevant factor in determining the appealability of a TRO. *See Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (permitting appeal of a TRO that "commanded an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena").

*Second*, the district court has now considerably prolonged that harm by setting its TRO to last for 14 days. *See* Minute Order (Mar. 15, 2025). It has done so without allowing the government an opportunity to respond to Plaintiffs' motion. And it has done so without offering any explanation of why a 14-day delay is appropriate. The district court is further potentially preparing to issue nationwide relief by scheduling an unusual emergency class certification hearing without any opportunity for the Government to respond. Such actions divest the Executive with key foreign affairs and national security authority oriented towards effectuating removal of individuals linked to a designated FTO—efforts that may be forever stymied if halted even temporarily. The Supreme Court has stressed that a district court cannot "shield its orders from appellate review merely by designating them as temporary restraining orders, rather than as preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974).

5

In any event, even if this Court were to conclude that the order is unappealable, the Court should exercise its discretion to treat this motion as a petition for writ of mandamus. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 n.6 (D.C. Cir. 1992). The district court's extraordinary order readily satisfies the standard to grant mandamus. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–381 (2004). First, if the district court's order is not appealable, then there is "'no other adequate means,'" *id.* at 380–381, for the government to vindicate the President's authority under Article II to exercise the Foreign Affairs power of the United States. Second, given the Supreme Court's recent decisions in *Collins v. Yellen*, 594 U.S. 220 (2021), and *Seila Law*, the government's "right to issuance of the writ is clear and indisputable," *Cheney*, 542 U.S. at 381 (quotation marks omitted). And finally, the issuance of the writ "is appropriate," *id.*—indeed, it is necessary—to protect our constitutional structure by safeguarding the President's prerogative against intrusion by the Judicial Branch.

## II. The District Court Erred in Issuing the TRO

The district court abused its discretion in granting a temporary restraining order without first hearing from the government, particularly as TdA has been designated as an FTO and there may be classified information underlying the determinations at issue.

6

The Secretary of State's designation of TdA as an FTO on February 20, 2025, represents the extraordinary finding that TdA is an organization that engages in terrorist activity that "threatens the security of United States nationals or the national security of the United States." *See* 8 U.S.C. § 1189(a)(1)(C). This Court, to which Congress assigned the sole jurisdiction over the review of FTO designations, *see* 8 U.S.C. § 1189(c)(1), has emphasized the limited and extremely deferential review of the Executive Branch's role in protecting the nation and its citizenry from terrorism. *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 838 (D.C. Cir. 2012); *see Islamic Am. Relief Agency v. Gonzales,* 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in [this] area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.").

As an initial matter, the balance of harms weighs decisively in favor of the United States. Effective and efficient removal of aliens linked to an FTO when that opportunity is available is a key priority for the United States, and leaving those individuals in the United States risks ongoing harm to the people of the United States. Further, removal operations entail delicate international negotiations and

7

halting them has the significant potential of never being repaired. On the other hand, contrary to Plaintiffs' claims, removal is not categorically irreparable harm. As the Supreme Court has explained, "[a]lthough removal is a serious burden for many aliens, it is not categorically irreparable, as some courts have said." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "It is accordingly plain that the burden of removal alone cannot constitute the requisite irreparable injury."

Finally, Plaintiffs filed in the wrong venue and the lower court lacked authority to act on these habeas petitions. Because these claims sound in habeas, the only proper venue is where the detainee is being held. *See, e.g.*, *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[T]he default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."). Plaintiffs acknowledge in their complaint that none of the Plaintiffs are detained in this district. *See* Compl. at 3-5. Filing in this District is an abuse of these clear rules, and the district court's order exacerbates that abuse. Plaintiffs have never been held in this district, as they acknowledge. Plaintiffs are detained in Texas. Any habeas claims must be brought against the custodians of those facilities (the "immediate custodian rule") and in the venues in which the custodians reside (the "habeas venue rule"). *See Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1097 (D.C. Cir. 2022); *Vetcher,* 316 F. Supp. 3d at 78 (identifying the district of confinement as the only appropriate venue for a habeas

8

petition); *see also Braden v. 30th Jud. Cir. Ct.*, 410 U.S. 484, 494-95 (1973) ("The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody."); *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 810 (D.C. Cir. 1988). Unless Plaintiffs are transferred within the authority of this district, this case should be dismissed for a lack of venue. *See* 28 U.S.C. § 1406(a); *see also Mendoza-Linares v. Garland*, 51 F.4th 1146, 1157 (9th Cir. 2022) (dismissing challenge to expedited removal order in part for failing to follow the requirement under Federal Rule of Appellate Procedure 22 to file in the district of confinement).

### III. The Government Is Likely to Succeed on the Merits of Plaintiffs' AEA Claims

Although the errors identified above are sufficient to establish that Defendants are likely to prevail on their appeal of the district court's order, Defendants are likely to prevail on the underlying merits of Plaintiffs' challenge to the government's AEA authority. The district court acted based on allegations that the removals would be pursuant to authority conferred by the AEA. But the determination of whether there has been an "invasion" or "predatory incursion," or whether national security interests have otherwise been engaged so as to implicate the AEA is fundamentally a political question to be resolved by the President. *See California*, 104 F.3d at 1091 (determination of an "invasion" under the constitution "implicates foreign policy concerns which have been constitutionally committed to the political branches"); *see*

9

*also El-Shifa Pharmaceutical Indust. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."). Likewise, to the extent the President must make threshold determinations as a prerequisite to invoking the AEA, those determinations would be "political judgments for which judges have neither technical competence nor official responsibility." *Ludecke v. Watkins*, 335 U.S. 160, 170 (1948).

To the extent any such AEA Proclamation akin to that alleged by Plaintiffs would be reviewable, it would be a proper exercise of the President's authority under 50 U.S.C. § 21 and is supported by the President's inherent Article II authority to conduct foreign affairs and address urgent and compelling immigration matters.

*First*, a Proclamation targeting TdA would appropriately target a "foreign nation or government." TdA's close and intimate connections with the Maduro regime, and its infiltration of key elements of the Venezuelan state, including military and law enforcement entities, make it sufficiently tied to Venezuela so as to be within the scope of the AEA. TdA's growth itself can be attributed to state sponsorship and promotion via the actions of former Governor of Aragua Tarcek El Aissami. And the Maduro regime's connections to the group, via the state-sponsored narco-terrorism enterprise Cartel de los Soles, are also clear. The Maduro regime

10

coordinates with and relies on TdA to "sow violence and discord throughout the United States," including through gang-related crimes and violent attacks such as the murder of Laken Riley in Georgia in February 2024.[2] Given how significantly TdA has become intertwined in the fabric of Venezuela's state structures, it is a de facto arm of the Maduro regime. In such a case, TdA becomes indistinguishable from Venezuela, and the two may be folded together for purposes of invoking Section 21.

As an independent rationale, TdA also operates as a de facto government in the areas in which it is operating. It is well known that the Maduro regime is closely linked to narco-terrorism; a major component of that is "corrupt[ing] the institutions of Venezuela" to flood the United States with drugs "to undermine . . . the wellbeing of our nation" and that Maduro "deliberately deploy[s] cocaine as a weapon."[3] In those areas where it is operating, TdA is in fact operating as a criminal *state*, independent or in place of the normal civil society and government. Given its governance and organizational structure, as well as its de facto control over parts of Venezuela in which it operates with impunity as an effective state unto itself, it would

---

[2] Peter Pinedo, Fox News, *Tren de Aragua are ideological terrorists disguised as a street gang warns former military officer* (Dec. 13, 2024), https://www.foxnews.com/politics/tren-aragua-ideological-terrorists-disguised-gang-warns-former-military-officer.

[3] Press Release, Dep't of Justice, *Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges* (Mar. 26, 2020), https://www.justice.gov/archives/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism.

11

be well within the discretion of the President to determine it constitutes a foreign "government" for purposes of invoking Section 21.

*Second*, TdA is clearly perpetrating an invasion *or* a predatory incursion into the United States. Although the definition of "invasion" most easily applies to a *military* entry and occupation of a country, the accepted definition of that term is far broader. An invasion is "[a]n intrusion or unwelcome incursion of some kind; esp., the hostile or forcible encroachment on another's rights," or "[t]he arrival somewhere of people or things who are not wanted there." Black's Law Dictionary, "Invasion," (12th ed. 2024). Nor is there any requirement that the purposes of the incursion are to possess or hold territory of the invaded country. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of what constitutes an invasion. Their illegal entry into and continued unlawful presence in the United States is an "unwelcome intrusion" of a foreign government linked entity that additionally entails hostile acts that are contrary to the rights of U.S. citizens to be free from criminality and violence.

Even if the actions of TdA do not fall within the broad definition of "invasion," they still constitute a "predatory incursion" that would justify invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States, (2) for purposes contrary to the interests or laws of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189-90 (S.D. Tex. 1945)

12

(noting use of the phrase to describe raids in Texas during hostilities with Mexico in the 1840s that fell well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully entering and fishing in U.S. territorial waters). Here, there is no question that TdA and its members have effected entries into the United States, and similarly no question that the purposes of that entry are contrary to both the interests and laws of this country—trafficking in substances and people, committing violent crimes, and conducting business that benefits a foreign government whose interests are antithetical to the United States. However else the actions of TdA can be characterized, they clearly constitute a "predatory incursion" into the United States.

Beyond the statute, the President's inherent Article II authority is plainly violated by the district court's order. As a function of his inherent Article II authority to protect the nation, the President may determine that TdA represents a significant risk to the United States, that it is intertwined and advancing the interests of a foreign government in a manner antithetical to the interests of the United States, and that its members should be summarily removed from this country as part of that threat. The exercise of authority in this case is firmly supported by longstanding precedent of the Supreme Court. As that Court has repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952); *United*

13

*States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). And where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.*, 50 U.S.C. § 21, coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (similar).

If anything, this authority is heightened in the context presented by this case. The Supreme Court has consistently noted that "[i]t is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Thus, "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an *inherent executive power*." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added).

## CONCLUSION

This Court should stay the district court's order pending appeal and should immediately enter an administrative stay. To the extent the Court harbors any doubt

14

about its appellate jurisdiction, it should treat this appeal as a petition for a writ of mandamus and grant a writ directing the district court to vacate its order.

Dated: March 15, 2025	Respectfully submitted,

        YAAKOV M. ROTH
        Acting Assistant Attorney General

        DREW C. ENSIGN
        Deputy Assistant Attorney General

        AUGUST E. FLENTJE
        Acting Director

        EREZ REUVENI
        Assistant Director

        BRIAN C. WARD
        Acting Assistant Director

By:	*Christina P. Greer*
        CHRISTINA P. GREER
        Senior Litigation Counsel
        Office of Immigration Litigation
        District Court Section
        United States Department of Justice
        P.O. Box 868, Ben Franklin Station
        Washington, DC 20530
        Phone: (202) 598-8770
        e-Mail: Christina.P.Greer@usdoj.gov

        PATRICK GLEN
        Senior Litigation Counsel

        *Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 3503 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

                                                 */s/ Christina P. Greer*
                                                 CHRISTINA P. GREER

## CERTIFICATE OF SERVICE

    I hereby certify that on March 15, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

                                               */s/ Christina P. Greer*
                                               CHRISTINA P. GREER