Oral Argument Not Yet Scheduled

**Nos. 25-5067 & 25-5068**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

J.G.G., *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as President of the
United States, *et al.*,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

**EMERGENCY MOTION FOR A STAY PENDING APPEAL**

PAMELA J. BONDI
U.S. Attorney General

CHAD MIZELLE
Chief of Staff

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
    Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

CHRISTINA P. GREER
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation & Appeals Section
United States Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20530
Phone: (202) 598-8770
e-Mail: Christina.P.Greer@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

## INTRODUCTION

A few hours ago, a District Court lacking jurisdiction issued an unprecedented, nationwide temporary restraining order ("TRO") purporting to halt the removal of aliens associated with Tren de Aragua ("TdA"), a designated foreign terrorist organization ("FTO") pursuant to both the President's constitutional authority to protect the nation and statutory authority under the Alien Enemies Act ("AEA"). A stay pending appeal is manifestly warranted, as is an immediate administrative stay.

This Court should halt this massive, unauthorized imposition on the Executive's authority to remove people that Defendants had determined to be members of TdA, a group the President and the Secretary of State have found to be a threat to national security. This Court should halt this unprecedented intrusion upon the Executive's authority to remove dangerous aliens who pose grave threats to the American people.

The district court acted without any jurisdiction—these claims sound in habeas. *See, e.g.*, *Ludecke v. Watkins* 335 U.S. 160 (1948) (considering challenge to action under AEA as habeas claim). Yet the plaintiffs waived their habeas claims after Defendants argued that only the Southern District of Texas, where plaintiffs were held, had jurisdiction over their claims. *See Rumsfeld v. Padilla*, 542 U.S. 425, 435 (2004).

1

The Presidential actions at issue here are not subject to judicial review, as this Court has squarely held. *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). Accordingly, there was no lawful basis for the district court to enjoin the implementation of that action. And even if reviewable, the President's action is lawful and based upon a long history of using war authorities against organizations connected to foreign states and national security judgments, which are not subject to judicial second guessing.

Further underscoring the impropriety of this TRO, Plaintiffs would not necessarily be irreparably injured by removal, as the Supreme Court has expressly held. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

If this TRO were allowed to stand, district courts would have license to enjoin virtually any urgent national-security action upon bare receipt of a complaint. District courts might next see fit to issue TROs restraining drone strikes, sensitive intelligence operations, or terrorist captures or extraditions. This Court should stay the district court's unprecedented order.

## BACKGROUND

### I.    The Alien Enemies Act

The AEA provides that:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by

> any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. § 21.

The courts have recognized the legitimacy of the AEA as an exercise of the war power reserved to Congress and the Executive. The Supreme Court has observed that the AEA is "as unlimited" a grant of power "as the legislature could make it." *Ludecke*, 335 U.S. at 164 (quoting *Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817)); *see also id.* at 165 n.8 (collecting cases). The Court has further explained that the statute encompasses "matters of political judgment for which judges have neither technical competence nor official responsibility." *Id.* at 170 (holding that the President's power under the AEA remained in effect even after actual hostilities in World War II had ceased). And this Court has held that this statute confers "[u]nreviewable power in the President to restrain, and to provide for the removal of, alien enemies." *Citizens Protective League*, 155 F.2d at 294. The courts have therefore limited their review in prior challenges to very narrow questions, there: "the construction and validity of the statute," whether, when relevant, there is a "declared war," and whether the "person restrained is an enemy alien fourteen years of age or older." *Ludecke*, 335 U.S. at 171 & n.17.

## II.     The President's Proclamation

The President published the *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua* (the "Proclamation") on March 15, 2025. *See* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/. The President made findings that members of the transnational criminal organization TdA, in conjunction with a narco-terrorism enterprise backed by the illegitimate regime of Nicolas Maduro in Venezuela, are "conducting irregular warfare and undertaking hostile actions against the United States." Proclamation Preamble. TdA has also "engaged in and continues to engage in mass illegal migration to the United States" for several purposes, including to inflict harm on U.S. citizens and support Maduro's regime in undermining democracy. *Id.* Further, TdA is "closely aligned with" and "has infiltrated" Maduro's regime, growing under Tareck El Aissami's governance of Aragua from 2012 to 2017. *Id.* Aissami is a "fugitive facing charges arising from his violations of United States sanctions triggered by his" designation as a Specially Designated Narcotics Trafficker under 21 U.S.C. § 1901 *et seq. Id.* And Maduro leads the "Cártel de los Soles, which coordinates with and relies on TdA and other organizations to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.*

Criminal organizations such as TdA have taken greater control over Venezuelan territory, resulting in the creation of a "hybrid criminal state" that poses "substantial danger" to the United States and is "perpetrating an invasion of and predatory incursion" into the nation. *Id.* (noting also INTERPOL Washington's finding that TdA has infiltrated the flow of immigrants from Venezuela). The TdA is a designated FTO under 8 U.S.C. § 1189. *Id.*

Based on these findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* § 1. The President further directed that all such alien enemies "are subject to immediate apprehension, detention, and removal." *Id.* § 3. The Attorney General and the Secretary of Homeland Security have been tasked with executing these directives, in addition to any separate authority to DHS has apprehend and remove such persons. *Id.* §§ 4, 6.

The President has further issued regulations prohibiting the entry, attempted entry, or presence of the alien enemies described in Section 1 of the Proclamation, with any such alien enemies "subject to summary apprehension." *Id.* § 6(a). Apprehended alien enemies are subject to detention until their removal from the

United States, and they may be removed to "any such location as may be directed" by those responsible for executing the regulations. *Id.* § 6(b)–(c).

## III.    This Suit

On March 15, 2025, five nationals of Venezuela who claim to fear removal under the Proclamation filed this class-action complaint and petition for a writ of habeas corpus along with a motion for TRO. In their complaint, Plaintiffs allege, among other things, that the Defendants' actions are contrary to the AEA and the Immigration and Nationality Act ("INA").

Hours after the complaint was filed, without the actual Proclamation and without hearing from the Government, the district court granted Plaintiffs' TRO motion and ordered that "Defendants shall not remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court." Second Minute Order (Mar. 15, 2025). A short time later the court set a hearing on Plaintiffs' motion for class certification for March 15, 2025, at 5:00 p.m. Third Minute Order (Mar. 15, 2025).

The Government appealed the district court's first TRO and filed an emergency motion to stay it. *See J.G.G. v. Trump*, No. 25-5067 (D.C. Cir. filed Mar. 15, 2025).

A few hours after the Government appealed, the district court held a hearing on the motion for class certification during which Plaintiffs dismissed their habeas

claims at the district court's suggestion. Afterward, the court issued an order (1) provisionally certifying a class of individuals determined by the Executive to be members of a designated FTO, defined as "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation . . . and its implementation," (2) enjoining the Government "from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court," and (3) setting a briefing schedule for a Government motion to vacate the TRO. Fourth Minute Order (Mar. 15, 2025). The Government noticed its appeal of this nationwide TRO and asks for an immediate stay.

## ARGUMENT

### I.     The TRO Is an Appealable Order.

This Court has jurisdiction to review the district court's order. Although TROs are ordinarily not appealable, they are when they are "more akin to preliminary injunctive relief." *Garza v. Hargan*, 2017 WL 9854552, at *1 n.1 (D.C. Cir. Oct. 20, 2017), *vacated in part on reh'g en banc*, 874 F.3d 735 (D.C. Cir. 2017), *vacated sub nom. Azar v. Garza*, 584 U.S. 726 (2018); *see Belbacha v. Bush*, 520 F.3d 452, 455

(D.C. Cir. 2008) (treating denial of TRO as "tantamount to denial of a preliminary injunction").[1] That is true here for two reasons.

*First*, the order would work an extraordinary harm to the President's authority to declare an invasion of the United States and his inherent Article II authority to repel such an invasion and conduct foreign affairs. Courts have consistently held that the Executive's determination of whether there is an "invasion" is a nonjusticiable political question. *See, e.g.*, *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). And the Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (Courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties."); *Trump v. United States*, 603 U.S. 593, 607 (2024) (The President "has important foreign relations responsibilities: [including] … recognizing foreign governments, … overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism, … and immigration."). The President's discretion in this context, and the court's lack of authority to hinder the exercise of that discretion, is plain under the AEA: "[t]he authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies)

---

[1] Because of the speed with which this case is moving, and because of the importance of the issues presented, it was not practicable to seek a stay pending appeal first in the district court. *See* Fed. R. Appellate Procedure 8(a)(1).

shall be subject, and in what cases,' is, of course, plenary and not reviewable." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919). This Court similarly described the statute as conferring "[u]nreviewable power in the President." *Citizens Protective League*, 155 F.2d at 294. This Court also has identified the significance of the harm that a TRO poses to the Executive as a relevant factor in determining the TRO's appealability. *See Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (permitting appeal of TRO "command[ing] an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena").

*Second*, the injunction risks scuttling delicate international negotiations to remove dangerous alien enemies, and even a short delay in removal can frustrate removal, full stop. *See Zadvydas v. Davis*, 533 U.S. 678, 696 (2001); Exhibit A, Declaration of Michael G. Kozak. Furthermore, the district court has extended the potential harm nationwide—after scheduling an unusual emergency class-certification hearing the same day of filing, the court ordered a nationwide provisional class certification and issued a universal TRO with no briefing by the Government on either issue. *Id.* The district court's actions divest the Executive of its key foreign-affairs and national-security authority oriented towards effectuating removal of alien enemies linked to a designated FTO—efforts that may be forever stymied if halted even temporarily. *See* Exh. A. The Supreme Court has stressed that a district court cannot "shield its orders from appellate review merely by designating

9

them as temporary restraining orders, rather than as preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 86–87 (1974).

And even if the order were unappealable, this Court should exercise its discretion to treat this motion as a petition for writ of mandamus. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 n.6 (D.C. Cir. 1992). The district court's extraordinary order readily satisfies the standard to grant mandamus. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004). First, if the district court's order is not appealable, then there is "no other adequate means," *id.* at 380–81, for the Government to vindicate the President's authority under Article II to exercise the Foreign Affairs power of the United States. Second, as explained below, the Government's "right to issuance of the writ is clear and indisputable," *Cheney*, 542 U.S. at 381 (quotation marks omitted). And finally, the writ "is appropriate," *id.*— indeed, necessary—to protect our constitutional structure by safeguarding the President's prerogative against judicial intrusion.

## II.     The District Court Erred in Issuing the TRO

The district court abused its discretion in granting provisional class certification and TRO without allowing the Government sufficient time to respond to Plaintiffs' motions.  As an initial matter, the balance of harms weighs decisively in favor of the United States.  The district court has enjoined the President from using his statutory and constitutional authority to address what he has identified as an

invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. The TRO thus "deeply intrudes into the core concerns of the executive branch," *Adams*, 570 F.2d at 954, and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

The Executive's authority in these areas, including "sensitive and weighty interests of national security and foreign affairs" that, when subject to judicial review at all, warrants the utmost deference. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–35 (2010). The Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring) (noting courts "must be deferential to the President's Article II foreign-policy judgment . . . with respect to American foreign policy and foreign relations").

Moreover, effective, efficient removal of enemy aliens linked to an FTO when that opportunity is available is a key priority for the United States, and avoids exposing U.S. residents to severe harm. *See* Proclamation Preamble (TdA "commits brutal crimes, including murders, kidnappings, extortions, and human, drug, and weapons trafficking."). The Secretary of State's designation of TdA as an FTO represents the extraordinary finding that TdA is an organization that engages in

11

terrorist activity that "threatens the security of United States nationals or the national security of the United States." *See* 8 U.S.C. § 1189(a)(1)(C). This Court, to which Congress assigned the sole jurisdiction over the review of FTO designations, *see* 8 U.S.C. § 1189(c)(1), has emphasized its limited and extremely deferential review of the Executive Branch's role in protecting the nation and its citizenry from terrorism. *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 838 (D.C. Cir. 2012); *see Islamic Am. Relief Agency v. Gonzales,* 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in [this] area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.").

And delayed removal may be removal denied. Removal operations entail delicate international negotiations, and those operations, once halted, have the significant potential of never resuming.

On the other hand, as the Supreme Court has explained, "[a]lthough removal is a serious burden for many aliens, it is not categorically irreparable, as some courts have said." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court reached that conclusion in a case where an alien argued he would face persecution if

removed. *Id.* at 422–23 ("Nken claimed he had been persecuted in the past" and "would be subject to further persecution if he returns"). *A fortiori* an alien member of an FTO cannot fairly assert irreparable harm from removal from the United States. *Id.* at 436 (Even where an alien asserts a risk of harm, there "is always a public interest in prompt execution of removal orders" that "may be heightened" if "the alien is particularly dangerous."). "It is accordingly plain that the burden of removal alone cannot constitute the requisite irreparable injury." *Id.* at 435.

## III.  The Government Is Likely to Succeed on the Merits of Plaintiffs' AEA Claims

Defendants are also likely to prevail on the underlying merits of Plaintiffs' challenge to the Government's exercise of AEA authority.

At the threshold, this case implicates questions outside the competence of the courts—questions only the political branches can resolve. *See Ludecke*, 335 U.S. at 164 ("The very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of its discretion."). The determination of whether there has been an "invasion" or "predatory incursion," whether an organization is sufficiently linked to a foreign nation or government, or whether national security interests have otherwise been engaged so as to implicate the AEA, is fundamentally a political question to be answered by the President. *See California*, 104 F.3d at 1091 (determination of an "invasion" under the constitution "implicates foreign policy concerns which have

been constitutionally committed to the political branches"); *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that . . . call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."). Accordingly, "[n]o constitutional principle is violated by the lodgment in the President of the power to remove alien enemies without resort or recourse to the courts." *Citizens Protective League*, 155 F.2d at 294.

Likewise, any threshold determinations the President must make before invoking the AEA are "political judgments for which judges have neither technical competence nor official responsibility." *Ludecke*, 335 U.S. at 170. The sole question potentially open to review is "whether the individual involved is or is not an alien enemy," *Citizens Protective League*, 155 F.2d at 294, but that is a claim sounding in habeas, *see id.*, and all habeas claims have been dismissed in this case (and were outside the district court's jurisdiction even if they had not been dismissed, as discussed in the Government's first stay motion), *see* Section III of the Background. In this case's current posture, there is no jurisdictional basis for a federal court's review of the Proclamation or any related determination—there can be no APA claim brought against the President's exercise of authority, and beyond that no claim of agency action.

Even if the Proclamation were reviewable at all, it is a proper exercise of the President's authority under the AEA and is reinforced by the President's inherent Article II authority to conduct foreign affairs and address urgent security threats and compelling immigration matters.

*First*, the Proclamation appropriately targets a "foreign nation or government." The President has vast discretion in making such a determination, and the findings satisfy any proper review in this context. *See Trump v. Hawaii*, 585 U.S. 667, 686 (2018) ("questionable" whether President's finding subject to any review). TdA's close and intimate connections with the Maduro regime, and its infiltration of key elements of the Venezuelan state, including military and law enforcement entities, make it sufficiently tied to Venezuela so as to be within the scope of the AEA. TdA's growth itself can be attributed to promotion via the actions of Aissami, Venezuela's Vice President. And the Maduro regime's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. The Maduro regime coordinates with and relies on TdA to "sow violence and discord throughout the United States." *See* Proclamation Preamble (noting utilization of TdA to "carry out its objective of using illegal narcotics as a weapon to 'flood' the United States"). The President could properly find that given how significantly TdA has become intertwined in the fabric of Venezuela's state structures, it is a de facto arm of the Maduro regime.

15

As an independent rationale, TdA also operates as a de facto government in the areas in which it operates. As the Proclamation recognizes, "Venezuela national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." *Id.* In those areas, TdA is in fact operating as a criminal *government*, independent or in place of the normal civil society and government. Given its governance and organizational structure, as well as its de facto control over parts of Venezuela in which it operates with impunity as an effective governing authority unto itself, it would be well within the discretion of the President to determine it constitutes a foreign "government" for purposes of invoking Section 21.

Although the Proclamation's findings adequately justify its treatment of TdA as a "government" for purposes of the AEA, the United States has a long history of using war powers against non-state actors. Historically, the United States has authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "military opponents who had no formal connection to the state enemy," including during the Mexican–American War and the Spanish–American War. *Id.* at 2066–67. President Wilson famously "sent more than seven thousand U.S. troops into Mexico to pursue Pancho Villa, the leader of a band of

rebels opposed to the recognized Mexican government," *id.* at 2067, while, more recently, President Clinton authorized missile strikes on al Qaeda targets in Africa and elsewhere, *see generally El-Shifa*, 607 F.3d 836. Military force is frequently invoked and used against non-state actors. Thus, even were TdA a non-state actor, rather than being intimately intertwined with the Maduro regime, the Proclamation is still valid under the AEA.

*Second*, TdA is clearly perpetrating an invasion *or* a predatory incursion into the United States. Although the definition of "invasion" obviously encapsulates a *military* entry , the accepted definition of that term is far broader. An invasion is "[a]n intrusion or unwelcome incursion of some kind; esp., the hostile or forcible encroachment on another's rights," or "[t]he arrival somewhere of people or things who are not wanted there." Black's Law Dictionary, "Invasion," (12th ed. 2024). Nor is there any requirement that the purposes of the incursion be to possess or hold territory of the invaded country. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of what constitutes an invasion. Their illegal entry into and continued unlawful presence in the United States is an "unwelcome intrusion" of a foreign-government-linked entity that additionally entails hostile acts contrary to the rights of U.S. citizens to be free from violence and criminality.

Even if the actions of TdA did not fall within the broad definition of "invasion," they still constitute a "predatory incursion" under Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States, (2) for purposes contrary to the interests or laws of the United States. *See, e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids in Texas during hostilities with Mexico in the 1840s that fell short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully entering and fishing in U.S. territorial waters).

Here, TdA and its members have entered the United States for purposes contrary to the country's interests and laws to engage in "predatory" activity under any meaning: illicit trafficking in controlled substances and people, committing violent crimes, and conducting business that benefits a foreign government antithetical to the United States. *See* Proclamation Preamble. Those actions clearly constitute "predatory incursions" into the United States.

Beyond the statute, the TRO violates the President's inherent Article II authority. As a function of such authority to protect the nation, the President determined that TdA represents a significant risk to the United States, that it is intertwined and advancing the interests of a foreign government in a manner antithetical to the interests of the United States, and that its members should be

summarily removed from this country as part of that threat. The exercise of authority in this case is firmly supported by longstanding Supreme Court precedent. As that Court has repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). And where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.*, 50 U.S.C. § 21, coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (similar); *see also Ludecke*, 335 U.S. at 164 (remarking that the AEA is "as unlimited" a grant of power "as the legislature could make it" (quoting *Lockington*, 15 F. Cas. at 760)).

If anything, this authority is heightened here. The Supreme Court has consistently noted that "[i]t is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Thus, laws involving

19

aliens are "implementing an *inherent executive power*." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added).

## IV.    The Universal TRO is Overbroad and Unconstitutional.

This Court held in *Citizens Protective League*, rejecting the plaintiffs' claims for injunctive relief against the AEA, that "[n]o constitutional principle is violated by the lodgment in the President of the power to remove alien enemies without resort or recourse to the courts." 155 F.2d at 294.

The AEA-related jurisprudence limiting the courts to habeas review of AEA-related enforcement sharply contrasts with the universal TRO issued by the district court over the members of the provisionally certified class with no habeas claims before it. AEA precedent establishes that the role of the courts is only to assess whether a detainee is subject to the AEA proclamation, not to probe the national-security and foreign-policy judgments of the President in issuing the proclamation itself. *Ludecke*, 335 U.S. at 164 (providing habeas review only of whether detainee was subject to the proclamation); *United States ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 652 (2d Cir. 1947) (same); *United States ex rel. Kessler v. Watkins*, 163 F.2d 140, 141 (2d Cir. 1947) (same). Moreover, while habeas jurisdiction must reach the custodian, *see Rasul v. Bush*, 542 U.S. 466, 483–84 (2004), here the court issued a nationwide injunction where most—if not all—of the provisional class members are beyond the court's jurisdiction. This sweeping order conflicts with the tight limits

20

on habeas jurisdiction, the AEA precedent under which review of AEA enforcement lies only in habeas, and the absence of other jurisdictional authority.

The highly truncated class procedures here were improper, an excuse for the Court to issue a universal injunction, which is incompatible with "'foundational' limits on equitable jurisdiction." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 24A831, slip op. 7 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissenting) (citation omitted). The injunction undermines longstanding deference to the Executive Branch's national security judgments, including the President's responsibility to identify and respond to threats posed by the TdA . Moreover, Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021), much less empower them to assume a position of authority over the governmental acts of another coequal department, "an authority which plainly [courts] do not possess." *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923). To the contrary, the courts have recognized the limitations of the judiciary in assessing national security information and judging the necessity of action to counter national security threats. *See Humanitarian Law Project*, 561 U.S at 34 ("[W]hen it comes to collecting evidence and drawing factual inferences in [the national security] area, the lack of competence on the part of the courts is marked") (internal quotations omitted).

## CONCLUSION

This Court should stay the district court's order pending appeal and should immediately enter an administrative stay. To the extent the Court harbors any doubt about its appellate jurisdiction, it should treat this appeal as a petition for a writ of mandamus and grant a writ directing the district court to vacate its order.

Dated: March 16, 2025          Respectfully submitted,

PAMELA J. BONDI                     EREZ REUVENI
U.S. Attorney General               Assistant Director

CHAD MIZELLE                        BRIAN C. WARD
Chief of Staff                      Acting Assistant Director

TODD BLANCHE
Deputy Attorney General         By: *Christina P. Greer*
                                    CHRISTINA P. GREER
EMIL BOVE                           Senior Litigation Counsel
Principal Associate Deputy          Office of Immigration Litigation
   Attorney General                 General Litigation & Appeals Section
                                    United States Department of Justice
YAAKOV M. ROTH                      P.O. Box 868, Ben Franklin Station
Acting Assistant Attorney General   Washington, DC 20530
                                    Phone: (202) 598-8770
DREW C. ENSIGN                      e-Mail: Christina.P.Greer@usdoj.gov
Deputy Assistant Attorney General
                                    PATRICK GLEN
AUGUST E. FLENTJE                   Senior Litigation Counsel
Acting Director

                                    *Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 4997 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Christina P. Greer*
CHRISTINA P. GREER

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Christina P. Greer*
CHRISTINA P. GREER