Oral Argument Not Yet Scheduled

_____

**Nos. 25-5067 & 25-5068**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

J.G.G., *et al.*,
*Plaintiffs-Appellees*,
v.
DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,
*Defendants-Appellants*.

_____

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

**PLAINTIFFS-APPELLEES' COMBINED BRIEF IN RESPONSE TO
EMERGENCY MOTIONS FOR STAY PENDING APPEAL**

Cody Wofsy
Noelle Smith
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
cwofsy@aclu.org
nsmith@aclu.org
osarabia@aclu.org

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar C. Jadwat
Sidra Mahfooz
Hina Shamsi
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Somil B. Trivedi
Bradley Girard
Michael Waldman
Sarah Rich
Skye Perryman
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org

dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
ojadwat@aclu.org
smahfooz@aclu.org
hshamsi@aclu.org

*Counsel for Plaintiffs-Appellees*

## INTRODUCTION

The district court's order falls within no exception which would allow for appeal of a Temporary Restraining Order, particularly given the expedited schedule on which the district court is operating, with a merits hearing set for this Friday, March 21. Nor does this case fall within the narrow parameters for a writ of mandamus. The government is likewise incorrect that this case must be brought in habeas in the district of confinement. Under settled law, this is not a "core" habeas action and consequently the "immediate custodian" rule on which Defendants rely is inapplicable.

The government is also wrong that plaintiffs' claims are unreviewable under the political question doctrine. Both the Supreme Court and this Court have made clear in recent decisions that the doctrine should be used sparingly, and that reviewability should be assessed on a claim-by-claim basis. Here, Plaintiffs contend that the specific statutory predicates for invoking the Alien Enemies Act ("AEA") have not been satisfied and that the Act's lack of any process violates the Constitution. No case law, under the AEA or otherwise, suggests that these statutory and constitutional claims are wholly unreviewable under the narrow political question doctrine. Indeed, the World War II case on which the government relies heavily, *Ludecke v. Watkins*, 335 U.S. 160 (1948), makes clear that these types of threshold statutory claims are reviewable. The claim *Ludecke* declined to review

1

was whether, where Congress and the President agreed the war was not yet over, the Court should declare otherwise. Here, by contrast, the President is trying to write Congress's limits out of the act.

On the merits, the invocation of the Act against a gang cannot be squared with the explicit terms of the statute requiring a declared war or invasion by foreign government. And given these explicit statutory predicates, the Act has unsurprisingly been invoked only three times in our country's history, all during declared wars.

On irreparable harm, the government claims that national security will be compromised by allowing the district court to decide these issues, even on an expedited basis. Yet the district court made clear that its order did not prevent the arrest and detention of any individual, mandate the release of any individual, or preclude removal under the immigration laws. And the government has not claimed that U.S. facilities are ill-equipped to detain these individuals (even assuming they are affiliated with the gang, a fact that is unknown given that none were afforded any opportunity to show that they do not fall under the Proclamation).

The implications of the government's position are staggering. If the President can designate any group as enemy aliens under the Act, and that designation is unreviewable, then there is no limit on who can be sent to a Salvadoran prison, or any limit on how long they will remain there. At present, the Salvadoran President

is saying these men will be there at least a year and that this imprisonment is

"renewable."

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The AEA is a wartime authority that grants the President specific powers with

respect to the regulation, detention, and removal of enemy aliens.  Passed in 1798 in

anticipation of a war with France, the AEA, as codified today, provides

> Whenever there is a declared war between the United States and any
> foreign nation or government, or any invasion or predatory incursion is
> perpetrated, attempted, or threatened against the territory of the United
> States by any foreign nation or government, and the President makes
> public proclamation of the event, all natives, citizens, denizens, or
> subjects of the hostile nation or government, being of the age of
> fourteen years and upward, who shall be within the United States and
> not actually naturalized, shall be liable to be apprehended, restrained,
> secured, and removed as alien enemies." 50 U.S.C. § 21.

On March 14, 2025, the President signed a proclamation entitled: "Invocation

of the Alien Enemies Act Regarding the Invasion of the United States by Tren de

Aragua."[1]  The Proclamation does not provide *any* process for individuals to show

they are not affiliated with the gang and instead authorizes the *summary* removal

certain Venezuelan noncitizens claimed to be members of a the gang, bypassing the

immigration laws that Congress has enacted providing a right to seek protection from

persecution and torture, and other forms of relief.

---

[1] https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/

Although the statute calls for a "public publication," the administration did not make the invocation public until 3:51pm EDT on March 15, after the authority had apparently been used. *See, e.g.*, Compl., ECF No. 1, No. 1:25-cv-766 (D.D.C. Mar. 15, 2025); Decl. of J.G.G. (ECF No. 3-3).[2]

Early on March 15, Plaintiffs filed a class action complaint alleging that the invocation of the AEA violated the express terms of the statute, illegally bypassed the immigration processes laid out in the INA and violated due process under the Fifth Amendment. Later that morning, the district court (Hon. James E. Boasberg) entered a temporary restraining order prohibiting Defendants from removing the named Plaintiffs pending a hearing. Defendants appealed the district court's TRO within hours. Notice of Appeal (ECF No. 12).

Late in the afternoon of March 15 and early evening, the district court held a lengthy hearing and provisionally certified a class consisting of "All noncitizens in U.S. custody who are subject to the March 15, 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation." Minute Order (Mar. 15, 2025). The district court then issued a temporary restraining order prohibiting Defendants for 14 days from removing members of the class (who were not otherwise subject to

---

[2] ECF No. refers to docket cites from the district court below. First Stay Mot. and Second Stay Mot. refer to the government's emergency stay motions, respectively, and page cites are to the pagination of the brief.

removal) pursuant to the Proclamation. *Id.* The district court issued a rapid briefing schedule for Defendants to move to vacate the temporary restraining order and set a hearing for March 21. *Id.* Just over an hour later, Defendants appealed the second temporary restraining order. Notice of Appeal (ECF No. 17). On Sunday, March 16, Defendants filed an emergency motion to stay both TROs pending appeal.[3]

## ARGUMENT

### I. The Court Should Deny A Stay Pending Appeal Because It Lacks Jurisdiction Over This Appeal.

Under settled principles of appellate jurisdiction, the Court lacks authority to consider this appeal. For that reason alone, it should deny Defendants' motion.

#### A. The Court Lacks Appellate Jurisdiction.

The government bears the burden of showing that this Court has jurisdiction over an emergency stay of an appeal of a temporary restraining order. *Kokkonen v.*

---

[3] On March 16, Defendants also filed a notice informing the district court that some individuals "subject to removal under the Proclamation had already been removed from United States territory under the Proclamation before issuance of this Court's second order." ECF No. 19. According to publicly available date and media reports (not disputed by Defendants), no plane containing such individuals had yet landed and the government continued to have custody and control of class members, both when the district court issued its oral order requiring Defendants to "immediately" return anyone still in the air to the United States, and when it issued its written order memorializing the temporary restraining order. March 15, 5 p.m. Hearing Tr. at 43:6-43:19 (ECF No. 20). Proceedings regarding whether the court's orders were complied with are ongoing as of the time of this brief.

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (party asserting jurisdiction bears burden to show jurisdiction).  It cannot meet that burden here, because TROs are not generally appealable.  *Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978); *see also* Wright & Miller, Fed. Prac. & Proc. Civ. § 2951 (3d ed. June 2024 update) (no statutory provision for the appeal of a temporary restraining order).  An appeal would be especially inappropriate here, where the district court set briefing and a hearing to consider the government's motion to dissolve the TRO within six days of issuance.  Minute Order (Mar. 15, 2025). To permit the district court's proceedings "before the district court has finished its work and issued a ruling on the preliminary injunction" would "disrupt, if not render obsolete, the proceedings in the district court."  *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-5046, 2025 WL 621396, at *1 (D.C. Cir. Feb. 26, 2025).

Defendants contend the TRO here is "akin" to a preliminary injunction, making this "the rare case" falling within an exception.  First Mot. 3; Second Mot. 7.  But none of their cases support that claim. Some of their cases address supposed orders that extended beyond the limited timeframe for a TRO.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61 (1974) (TRO "in no way limited in time"); *Belbacha v. Bush*, 520 F.3d 452, 458-59 (D.C. Cir. 2008) (20 days).  Others threatened to conclusively decide central issues or foreclose relief, rather than freezing the status quo while a preliminary injunction was assessed.  *See, e.g.*, *Garza v. Hargan*, No. 17-5236, 2017

6

WL 9854552, at *1 n.1 (D.C. Cir. Oct. 20, 2017) (parties agreed that abortion would be performed under TRO); *Adams*, 570 F.2d at 953 (TRO required Secretary of State to make statement); *Belbacha*, 520 F.3d at 458 (denied request to restrain petitioner's transfer to country where he alleged that he faced torture ).

Here, by contrast, the TRO is a classic short pause to allow for further briefing. The pause merely preserves the status quo and does not definitively resolve any controversy. *See Native Village v. Lujan*, 1991 WL 40471, *1 (D.C. Cir. Mar. 8, 1991) (showing that a TRO has "irretrievable consequences" is a "high threshold"); *see also Hoh v. Pepsico, Inc.*, 491 F.2d 556, 559-60 (2d Cir. 1974) (Friendly, J.) (decision on TRO that amounts to issuing a preliminary injunction is "the rare case"). That conclusion is underscored by the district court's expedited briefing schedule and hearing date—Defendants were given, at their request, two days to submit briefing and a hearing in six days. *See Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (Burger, C.J., in chambers) (distinguishing *Adams* because "the opinion of the District Court explicitly contemplated a prompt hearing on a preliminary injunction"); *Native Village*, No. 91-5042, 1991 WL 40471, at *1 (noting "the expedition with which the district court is proceeding to resolve this matter"). That this case involves "weighty" interests does not change the general rule: those interests were being swiftly, and carefully,

7

evaluated by the district court, which was preserving the status quo until it could deliberate.

The rest of the government's arguments speak to the merits, which the district court has said it is prepared to carefully weigh and decide, and which Plaintiffs address below.

### B.    An Exercise of Mandamus Jurisdiction Is Unwarranted.

Defendants' alternative claim that this Court should exercise mandamus jurisdiction—set forth in just five sentences—fares no better.  Second Mot. 10. Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes," *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004).  A court should issue the writ "only if (1) the party seeking issuance of the writ has no other adequate means to attain the relief he desires; (2) the petitioner satisfies the burden of showing that his right to issuance of the writ is clear and indisputable; and (3) the issuing court, in the exercise of its discretion, is satisfied that the writ is appropriate under the circumstances."  *Flynn*, 973 F.3d at 78.  This Court regularly rejects such requests, *see, e.g.*, *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *9 (D.C. Cir. Feb. 15, 2025); *In re Garland*, No. 23-5154, 2023 WL 5662104, at *1 (D.C. Cir. Sept. 1, 2023).

Defendants cannot explain why the asserted abstract harm to the President's Article II foreign affairs power requires extraordinary mandamus relief from an

order that lasts merely two weeks and does not require the release of any individual

from detention, preclude anyone's arrest, or bar removal under the immigration laws.

*See In re al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015) ("abstract concern with the

separation of powers" is not "irreparable injury").  And because no administration

has ever attempted to invoke the AEA in circumstances so far removed from the text

of the statute, the government also cannot point to cases granting relief in a matter

involving like issues and comparable circumstances.  Rather, such "open" legal

questions are "the antithesis of the 'clear and indisputable' right needed for

mandamus."  *In re Nashiri*, 791 F.3d at 85-86.  In sum, the government seeks to

"undermine the established framework for litigating TROs and preliminary

injunctions" and to "short-circuit ongoing proceedings before the district court."

*Dellinger*, 2025 WL 559669, at *9.  That in itself is extraordinary and inappropriate.

## II.    Defendants Fail To Establish Their Entitlement To Extraordinary Relief.

Even if this Court were to reach the merits, Defendants have not carried their

burden.  A stay pending appeal is an "extraordinary" remedy.  *KalshiEX LLC v.*

*Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quoting

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017

(D.C. Cir. 2018) (per curiam).  To obtain such exceptional relief, the stay applicant

must (1) "make a strong showing that it is likely to succeed on the merits; (2)

demonstrate that it will be irreparably injured before the appeal concludes; (3) show

that issuing a stay will not substantially injure the other parties interested in the proceedings; and (4) establish that the public interest favors a stay." *Id.* (internal quotations omitted). The balance of equities and the public interest factors merge in cases against the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

### A.    Defendants Are Not Substantially Likely To Prevail On The Merits.

#### i.    Defendants Are Not Likely To Prevail On Their Claim That Plaintiffs' Claims Are Not Justiciable.

As a threshold matter, Defendants contend that Plaintiffs claims are barred by the "political question" doctrine. Second Mot. 8-9, 13-14. The political question doctrine is, however, a "narrow exception" to courts' presumptive exercise of jurisdiction. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). It has no bearing on Plaintiffs' claims about the construction and interpretation of a federal statute, the interplay between that statute, due process, and the nation's immigration laws, and the limits Congress has placed on the President's authority— all core functions of the judiciary in our system of separated powers.

Indeed, as then-Judge Kavanaugh pointed out, "[t]he Supreme Court has never applied the political question doctrine in cases involving statutory claims" that "the Executive Branch violated congressionally enacted statutes that purportedly

constrain the Executive." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring).

And in the context of the AEA, the Supreme Court has confirmed that claims like Plaintiffs' are justiciable. *Ludecke v. Watkins*, 335 U.S. 160 (1948), on which Defendants rely, emphasized that "resort to the courts" was available "to challenge the construction and validity of the statute," *id.* at 171, and explicitly acknowledged that the AEA does not preclude judicial review of "questions of interpretation and constitutionality," *id.* at 163-64. Such questions—the "construction" and "interpretation" of the AEA—are precisely what Plaintiffs are advancing here.

Plaintiffs raise three key statutory arguments: (1) the AEA's use of "invasion" and "predatory incursion" refer only to military action in the context of an actual or imminent war; (2) a criminal gang is not a "foreign government or nation"; (3) even if the AEA applies, it still requires compliance with the INA and other later-enacted, more specific statutory protections for immigrants, as well as an opportunity to show that one does not fall under the Proclamation.

These are precisely the kinds of legal questions which Courts can and must decide. The political question doctrine "is primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and so the judiciary *must* act when the questions at issue fall within its own competence. *See, e.g.*, *U.S. Dep't of Com. v. Montana*, 503 U.S. 442, 458-59 (1992) ("As our previous rejection of the

11

political question doctrine in this context should make clear, the interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary."); *Al-Tamimi v. Adelson*, 916 F.3d 1, 11 (D.C. Cir. 2019) ("Policy choices are to be made by the political branches and purely legal issues are to be decided by the courts."); *Baker*, 369 U.S. at 217 (courts "will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power"). *See generally Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2257 (2024) (emphasizing that "the final 'interpretation of the laws' [is] 'the proper and peculiar province of the courts'") (quoting Federalist No. 78 (A. Hamilton)).

Plaintiffs' arguments require the Court to engage in statutory analysis, based on the text and history of the AEA and canons of construction. This type of statutory interpretation is a familiar exercise for courts. In *Zivotofsky*, 566 U.S. at 201, the Court held that where the parties' arguments "sound in familiar principles of constitutional interpretation," including reliance on "the textual, structural, and historical evidence"—the exact kind of interpretive tools required resolve the AEA's metes and bounds—that is "enough to establish that this case does not 'turn on standards that defy judicial application.'" And in *Japan Whaling Association v. Cetacean Society*, the Supreme Court rejected the idea that a "purely legal question of statutory interpretation" should be held nonjusticiable merely because it "involve[d] foreign relations," explaining that "interpreting congressional

legislation is a recurring and accepted task for the federal courts" and the case "call[ed] for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below." 478 U.S. 221, 230 (1986); *see also Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018) ("[A] court must determine whether the circumstances involve an act of war within the meaning of the statutory exception. That interpretive exercise, unlike with a non-justiciable political question, 'is what courts do.'"); *Al-Tamimi*, 916 F.3d at 12 n.6 (D.C. Cir. 2019) ("statutory interpretation is generally committed to the judicial branch").

The government nonetheless suggests that virtually every statutory question here is unreviewable—including what Congress meant by "invasion" or "predatory incursion," and what counts for purposes of the statute as a "foreign government or nation." *See* Mot. 13. But it can cite no case supporting that extraordinary claim. Indeed, *Ludecke* said just the opposite, and nothing about Plaintiffs' statutory claims challenges "the exercise of [the President's] *discretion*," *id.* (quoting *Ludecke*, 335 U.S. at 164), in deciding who should be removed under the AEA *within the statutory framework Congress has set*. Rather, Plaintiffs' principal claims are that the President has exceeded those statutory limits in various ways.

In Defendants' other AEA case, *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946), Second Mot. 2, this Court merely observed that

"[u]nreviewable power in the President to restrain, and to provide for the removal of, *alien enemies in time of war* is the essence of the Act." *Id.* (emphasis added). In other words, where the AEA's statutory prerequisites have been met, the President has "the power to remove alien enemies." *Id.* If anything, *Citizens Protective League* only underscores that the AEA's activation is limited to times of war and imminent war. *See infra.* And to the extent *Citizens Protective League* has language that might be read to suggest any broader justiciability rule, *Ludecke*'s holding that courts may review "questions of interpretation and constitutionality"—including "the existence of the 'declared war'"—controls. *Ludecke*, 335 U.S. at 163, 171.

The other aspect of *Ludecke* on which the government relies underscores the same separation-of-powers point. *See* Mot. 14. The "political judgment[]" which the Court declined to revisit, *see id.* (quoting *Ludecke*, 335 U.S. at 170), was the question of when a declared war would be considered "over" for the purposes of the statute. The petitioner there asserted that World War II had ended when "actual hostilities" ceased—even though Congress had formally declared war and neither Congress nor the President had declared the war over. *Ludecke*, 335 U.S. at 170 & n.15; *cf. U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952) (holding that congressional action ended war and AEA authority). The Court never suggested that the existence of a predicate war, invasion, or incursion would be nonjusticiable; to the contrary, it specifically recognized "the existence of [a] 'declared war'" as

14

reviewable. *Ludecke*, 335 U.S. at 171. Instead, the Court declined to unilaterally hold that the war had ended, emphasizing that Congress's declaration of war remained in effect. *Id.* at 168. That narrow holding in no way precludes judicial review of the claims here: namely, that the President is exceeding the authority granted by, and violating the limits set by, Congress.

Resisting this conclusion, the government cites out-of-circuit precedent addressing the Constitution's Invasion Clause. Second Mot. 13 (citing *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997)). Setting aside the inconsistency between that court's broad-brush approach to the political question doctrine and subsequent guidance from the Supreme Court and this Court on the proper, narrow application of the doctrine, such constitutional analysis is simply inapposite. The political question doctrine serves to reinforce the separation of powers. It is particularly critical for the judiciary to enforce the separation of powers when inter-branch disputes arise—where, as here, the executive violates or exceeds a statute. *See El-Shifa Pharm. Indus. Co*, 607 F.3d at 855 (Kavanaugh, J., concurring); *Al-Tamimi*, 916 F.3d at 12 n.6 ("a statutory claim is less likely to present a political question").

As the Supreme Court has explained, "[t]he Judicial Branch appropriately exercises" review "where the question is whether Congress or the Executive is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky*, 566 U.S. at

15

197; *cf. Youngstown*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). That is precisely what this case is about.

      **ii. Defendants Are Not Likely To Prevail On Their Claim That Venue In D.C. Is Improper.**

Defendants concede that courts have jurisdiction to review whether each person subject to the order "is or is not an alien enemy" and thus properly subject to the Proclamation. Second Mot. 14. That jurisdiction is unquestionable even in the case of a declared war against a foreign nation (where nationality is easily proved), and it is even more so here—where alleged gang associations are a highly contestable predicate for invocation of the AEA. *Ludecke*, 335 U.S. at 171. Instead, Defendants argue that the District of Columbia is an improper venue to raise that question because it "is a claim sounding in habeas." Second Mot. 14. But there is no bar to Plaintiffs bringing claims outside habeas for the harms they allege.

Habeas is required where a claim (1) "goes directly to the constitutionality of the physical confinement itself" and (2) "seeks either immediate release from that confinement or the shortening of its duration." *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973). But Plaintiffs do not seek release from custody. Nor are they challenging the validity of their confinement or seeking to shorten its duration. Rather, they challenge their removal without ordinary immigration processes, which is properly considered outside of habeas. *See Davis v. U.S. Sent'g Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013) (person in federal custody "need bring his claim in

habeas only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration'" (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)); *see also* Brief for the United States, *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), 2019 WL 6727092, at *33 ("a challenge to an alien's deportation remains outside the 'historical core' of habeas"); *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 159 (D.D.C. 2021), *aff'd in part, rev'd in part and remanded*, 27 F.4th 718 (D.C. Cir. 2022) (considering challenge to use of Title 42 to bypass ordinary immigration procedures by class detained in Texas).

The government cites no caselaw for its bald assertion that "review of AEA enforcement lies only in habeas."[4]  Second Mot. at 21.  Nor can it.  No court has required that challenges to the AEA be brought in habeas.  In fact, the only D.C. Circuit case reviewing threats of removal under the AEA did not involve claims brought in habeas.  *See Citizens Protective League v. Clark*, 155 F.2d 290, 291 (D.C. Cir. 1946)[5]; *see also Citizens Protective League v. Byrnes*, 64 F. Supp. 233, 233

---

[4] While *Ludecke* happened to involve a challenge brought in habeas, nothing in the decision requires AEA challenges to lie in habeas.  Moreover, that case preceded Supreme Court cases that distinguish between core and non-core habeas petitions, and it did not address venue or the immediate custodian rule.

[5] The fact that the cases consolidated in *Clark* were not habeas petitions is evident on their face.  None of the complaints mention habeas or allege the court's habeas jurisdiction.  And, in its motion to dismiss one of the cases, the government argued that Plaintiffs "have an adequate remedy at law by petition for writ of habeas corpus," indicating that even the government did not view the complaint as a habeas petition.  *Citizens Protective League v. Clark*, 155 F.2d 290 (1946),

(D.D.C. 1946). And, of course, no examples of challenges to AEA removals under the INA or the APA exist because those statutes were not yet in place when any of the prior AEA proclamations or regulations were issued.

Indeed, courts within this Circuit regularly review constitutional, statutory, and APA challenges brought by people incarcerated or detained outside of Washington D.C. *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1300 (D.C. Cir. 2019) (affirming in part injunction against the government's policy on behalf of a class of unaccompanied noncitizen minors in custody nationwide); *Bailey v. Fulwood*, 793 F.3d 127, 135-36 (D.C. Cir. 2015) (evaluating merits of ex post facto claim brought by prisoner incarcerated outside of D.C.); *see also Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018) (granting injunction to class of detained plaintiffs challenging parole practices at five ICE field offices across the country); *Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 94 (D.D.C. 2020), *judgment entered,* 568 F. Supp. 3d 10 (D.D.C. 2021) (considering APA challenge by class of detained noncitizen located across the country); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 531 (D.D.C. 2020) (certifying class of all unaccompanied noncitizen children who are or will be detained in US government custody in the country and who would be subject to Title 42 expulsions); *S. Poverty*

---

Appendix at 11 (Mar. 28, 1946) (available upon request from the D.D.C. clerk). Moreover, the district court resolved all three complaints on the merits—not on jurisdictional grounds. *Id.* at 6, 11-12, 24.

*L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-cv-760, 2019 WL 2077120, at *3 (D.D.C. May 10, 2019) (declining to transfer constitutional and APA challenges by immigration detainees in Georgia and Louisiana from D.C.).

Moreover, this rule applies even when the claim *could* also have been brought in habeas. *See, e.g.*, *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 126-27 (D.D.C. 2018) ("Although . . . many of the relevant cases challenging the government's treatment of asylum seekers lie in habeas, those cases do not stand for the proposition that they could only have been brought as habeas petitions."); *R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 185 (D.D.C. 2015) ("Insofar as the Government alternatively argues that Plaintiffs are required to proceed in habeas rather than under the APA, they have not provided a compelling reason why this is so. APA and habeas review may coexist.").

Finally, even if habeas were the required vehicle—and it is not—venue in D.C. is still proper. When a petition does not challenge the detention itself as unlawful, and seeks relief other than simple release, the immediate custodian rule does not apply. *Wilkinson v. Dotson*, 544 U.S. 74, 92 (2005). Instead, "because 'the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody,'" a district court acts 'within [its] respective jurisdiction' within the meaning of § 2241 as long as 'the custodian can be reached by service of process.'" *Rasul v. Bush*, 542 U.S. 466, 478-

79 (2004) (quoting *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 494-95 (2004)). The entities responsible for this restraint reside in their official capacity in the District of D.C. In contrast, all of the cases cited by the government in support of application of the immediate custodian rule involved core habeas cases seeking release. *See* First Mot. 8-9.

### iii. Defendants Are Not Substantially Likely To Prevail On Their Merits Arguments.

The AEA has only ever been invoked during a declared war: the War of 1812, World War I, and World War II. Defendants now seek to invoke this limited wartime authority to execute summary removals wholly untethered to any actual war or to the specific conditions Congress enacted. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is well warranted here.

*First*, as a categorical matter, there is no "invasion" or "predatory incursion" upon the United States to support the AEA's invocation. Defendants' attempt to redefine these terms by citing modern dictionaries and usages, Second Mot. 17-18, is entirely disconnected from the AEA's text and historical context. The text and history make clear that the AEA's terms refer to military actions by foreign governments that imminently lead to or constitute acts of war. *See, e.g.*, Office of Legislative Affairs, Proposed Amendment to AEA, at 2 n.1 (Aug. 27, 1980) ("The

Act contemplates use of its provisions by the President in situations where war is imminent."); *Ludecke*, 335 U.S. at 169 n.13 (explaining that "the life of [the AEA] is defined by the existence of a war"). At the time of the enactment, an "invasion" was a large-scale military action by an army intent on territorial conquest. *See* Webster's Dictionary, Invasion (1828) ("invasion" is "particularly, the entrance of a hostile army into a country for purpose of conquest or plunder"); Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776) (describing the goal of British invasion as "the conquest of America").[6]

And "predatory incursion" referred to smaller-scale military raids aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war. *See* Webster's Dictionary, Predatory (1828) ("predatory" underscores that the purpose of a military party's "incursion" was "plundering" or "pillaging"); *id.*, Incursion (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine"); Letter from George Washington, Commd'r in Chief of Army, to Thomas Jefferson, Gov. of Va. (Feb. 6, 1781) (describing a British raid that destroyed military supplies and infrastructure in

---

[6]  *Available at*
https://founders.archives.gov/?q=invasion%20conquest&s=1111311111&sa=&r=1
7&sr=.

Richmond as a "predatory incursion"); Letter from George Washington, Commd'r in Chief of Army, to Nathanael Greene, Commd'r in Chief of Southern Dep't of Army (Jan. 29, 1783) ("predatory incursions" by the British could be managed with limited cavalry troops). "Mass illegal migration" or criminal activities are categorically not an "invasion" or "predatory incursion" threatening war. *See United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024) (rejecting argument that cartel's criminal activity and immigration constitute an "invasion"). If they were, virtually any group could be deemed enemy aliens.

Defendants cite two cases as examples of a broad understanding of "predatory incursion." Mot. 18 (citing *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) and *Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992)). Neither case is applicable. *Amaya* used "predatory incursion" in the context of military forces or actions—not nonstate actors like TdA. *See* 62 F. Supp. at 184, 189-90. And *Davrod* mentioned "predatory incursion" in passing, while analyzing the Magnuson Fishery Conservation and Management Act—a statute whose text and known legislative history make no reference to the term. *See* 971 F.2d at 785; 16 U.S.C. § 1801 *et seq.*; 128 Cong. Rec. 31695 (97th Cong. 2d Sess., Dec. 16, 1982). Moreover, both cases long post-date the AEA's enactment and shed no light on its original meaning.

*Second*, the purported invasion here is not by a "foreign nation or government." As a threshold matter, Defendants cite *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) to argue that it is "questionable" whether a President's finding on the matter is subject to any review. But *Hawaii* was about INA § 212(f), which "exudes deference to the President in every clause," *id.* at 684, including delegating to the President to "find[]" what categories of noncitizens should be barred, 8 U.S.C. § 212(f). In contrast, the AEA sets a predicate for invocation—"[w]henever there is a declared war" or "any invasion or predatory incursion is perpetrated, attempted, or threatened"—not a presidential finding. And Defendants' reliance on the President's "findings" and the historical use of war powers against nonstate actors, Second Mot. 15-17, overlooks the clear definitions of "nation" and "government" and Congress's specific limitation of the AEA to state actors. A "nation" and "government" are defined by their possession of territory and legal authority. *See* Samuel Johnson's Dictionary, Nation (1773) ("A people distinguished from another people; generally by their language, original, or government."); Samuel Johnson's Dictionary, Government (1773) ("An established state of legal authority.").

As a nonstate actor, however, Tren de Aragua ("TdA") possesses neither a defined territory nor a common government. While the United States has, at times, used force against non-state actors, Second Mot. 16-17, the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not a

criminal gang like TdA. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war . . ."); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent.").

*Third*, the Proclamation illegally bypasses the INA's procedures that Congress established for the removal of noncitizens. Defendants are silent on this argument despite Plaintiffs raising it in the district court. The INA, enacted after the AEA, is the "sole and exclusive procedure" for removal, 8 U.S.C. § 1229a(a)(3), with distinct procedures for expedited removal or national security cases. 8 U.S.C. § 1229a(a)(3) (expedited removal proceedings); 8 U.S.C. § 1531 et seq. (fast-track proceedings for noncitizens posing national security risks). Moreover, 8 U.S.C. § 1442(e) expressly requires that the removal of alien enemies be "consistent with the law." No carve-out exists for "alien enemies" with respect to removal, and the Proclamation's failure to adhere to this framework contradicts Congress's intent. The Proclamation also unlawfully overrides statutory protections for noncitizens seeking relief from persecution or torture, subjecting them to removal without considering their claims. *See* 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal); 1231 note (protections under the Convention Against Torture). Further, the Proclamation and the government's summary removals violate the AEA's voluntary departure

24

provision in the absence of an individualized finding of "actual hostility, or other crime against the public safety." *See* 50 U.S.C. §§ 21-22.

Finally, Defendants' far-reaching argument that the TRO violates the President's inherent Article II authority is flatly wrong. Second Mot. 18-20. The President has no constitutional power to unilaterally remove people. Under Article I, Congress holds plenary power over immigration, *INS v. Chadha*, 462 U.S. 919, 940 (1983), and has a broad, distinct set of war powers, *Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006). Through the INA and a variety of statutory safeguards, Congress comprehensively regulated the removal of immigrants. *See supra*. And through the AEA, Congress granted a specific set of war powers to the President; he is not at liberty to exceed those statutory powers or to exercise them outside of the context of war or imminent war. Congress did not authorize the President's actions under the AEA, and the Proclamation violates Congress's other delegations of statutory authority concerning immigration. *See Youngstown*, 343 U.S. at 637-38 ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb. . . . Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject."). There is simply no basis for disabling Congress's specific, bounded delegations of authority in the AEA and the INA, and ultimately Congress's

constitutional power to legislate with respect to immigration, including in times of war.

Moreover, even when the executive asserts war powers, the Supreme Court has repeatedly refused to grant the President a blank check as Commander-in-Chief. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 732 (2008) (rejecting executive's argument that noncitizens designated as "enemy combatants" outside the United States have no habeas privilege); *Hamdan*, 548 U.S. at 593 (interpreting statutes constraining the President's war powers; rejecting executive's arguments about the scope of the Uniform Code of Military Justice); *Hamdi v. Rumsfeld*, 542 U.S. 507, 530, 535-36 (2004) (plurality op.) (rejecting executive's arguments about the process due to alleged enemy combatants);[7] *Ex parte Milligan*, 71 U.S. 2, 125 (1866) ("[The Founders] knew—the history of the world told them—the nation they were founding, be its existence short or long, would be involved in war . . . and that unlimited power, wherever lodged at such a time, was especially hazardous to freemen.").

---

[7] *See also Hamdi*, 542 U.S. at 530: "as critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat."

Because the Proclamation and its enforcement exceed the statutory and constitutional bounds set by Congress, Defendants are substantially unlikely to prevail on the merits.

## B. Defendants Fail To Establish That They Will Be Irreparably Injured.

Defendants claim that they face "extraordinary harm" despite the district court only preserving the status quo for a short period. Second Mot. 8. But Defendants' extraordinary harm argument conflates the merits with the irreparable harm inquiry and presumes—mistakenly—that it is correct on the merits. *See Trump v. Thompson*, 20 F.4th 10, 47 (D.C. Cir. 2021). And to the extent Defendants' complaint is about the operation of the injunction against the President's operations, Second Mot. 8., those objections are misplaced. Reinforced by an unbroken line of Supreme Court precedent, courts "can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order," including in context of foreign affairs, national security and immigration. *Id.* (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Boumediene v. Bush*, 553 U.S. 723 (U.S. June 19, 2008), *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (enjoining lower court officials). That is no different here, where courts are clearly permitted to review the statutory bounds of the AEA; *see also Ludecke*, 335 U.S. at 163, 171 (courts may review "questions of interpretation"). And "despite the Defendants' invocation of national security

interests, the government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *Luokung Tech. Corp. v. Dep't of Def.,* 538 F. Supp. 3d 174, 195 (D.D.C. 2021).

Defendants "make[] no credible attempt to deny that Plaintiffs will suffer irreparable harm if they are expelled to places where they will be persecuted or tortured." *Huisha-Huisha*, 24 F.4th at 733. Rather, Defendants rely on cursory untested allegations about how Plaintiffs are dangerous gang members—while arguing that there is no jurisdiction to test those allegations and without acknowledging that existing authorities *already* permit Defendants to lawfully detain and remove any truly dangerous individuals, authority the district did not touch. *See e.g.*, 8 U.S.C. §§ 1158(b)(2)(A)(ii)-(iii) (noncitizens barred from asylum if convicted of particularly serious crime or if "serious reasons to believe" they "committed a serious nonpolitical crime" outside the U.S.); 8 U.S.C. § 1231(b)(3)(B)(ii)-(iii) (same for withholding); *see also* 8 U.S.C. §§ 1226(c), 1231(a)(6).

Defendants' reliance on *Niken* is similarly misguided. In *Niken*, the lack of irreparable injury from removal was predicated on being able to return, but here, the government has taken the position that the judiciary loses authority once an aircraft departs. *Nken v. Holder*, 556 U.S. 418, 436 (2009) (noting noncitizens "may continue to pursue a petition for review, and . . . relief by facilitation of their return,

along with restoration of the immigration status).  Additionally, *Nken* highlighted "a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Id.*  And Defendants' public safety rationales ring hollow where the TRO applies only to people detained and thus places no impediment to law enforcement and immigration officials continuing to arrest and/or detain individuals pending removal in order to protect public safety.

Moreover, Defendants fail to identify any concrete or irreversible consequences that will result from allowing the temporary restraining order to remain in place for a short period of time.  *See United States v. Bolton*, 468 F. Supp. 3d 1, 2, 6 (D.D.C. 2020) (denying government's motion despite "national security concerns" because it failed to show irreparable harm necessary to alter status quo). Plaintiffs were already in secure custody before the President invoked the AEA; keeping them in custody for a few more days poses no discernable risk to national security.

Defendants cite *Zadvydas* for the proposition that even a short delay could "frustrate removal full stop."  Second Mot. at 9.  But *Zadvydas* does not say that. 544 U.S. at 696 (rejecting the government's stated concern that court proceedings would interfere with "'sensitive' repatriation negotiations").

## C.    The Remaining Equitable Factors Weigh Heavily Against Defendants.

29

Finally, the balance of equities and public interest confirm that Defendants do not merit a stay of a district court order that applies only to people already in the government's custody and requires nothing other than preserving the status quo. Defendants' broad assertion of harm is premised on the public's exposure to "enemy aliens," but they do not explain how that can occur when the entire class is, by definition, limited to those already in detention.[8]   This unsubstantiated harm is outweighed by the public interest in keeping a check on extraordinary Executive overreach and respecting congressional mandates by not sending people to places where they face life-threatening conditions, torture, and persecution.

Defendants also cite the public interest in "prompt execution of removal orders."   Second Mot. at 13.   But that refers to noncitizens "lawfully deemed removable."   *Nken*, 556 U.S. at 436.   The Plaintiff here have not been "lawfully deemed removeable," because if they had been they could be removed in the usual course and the government would have no need to rely on the AEA.   *Hawaii v. Trump*, 878 F.3d 662, 700 (9th Cir. 2017), *rev'd and remanded on other grounds,* 585 U.S. 667 (2018) ("public interest is best served by 'curtailing unlawful executive

---

[8] While both of Defendants' motions fail for all of the reasons listed above—lack of jurisdiction over the appeal and inability to show likelihood of success on the merits, irreparable harm, or equities—the first motion is especially weak with respect to irreparability and equities.   Keeping five men in custody for a few days hardly causes the government irreparable harm or raises any sort of public safety concerns or other concerns implicating the public interest.

action"); *see also League of Women Voters v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016) ("substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (citation omitted)).

The public's interest in restraining unlawful conduct remains true in cases involving immigration and foreign affairs.  *See, e.g.*, *Huisha-Huisha*, 27 F.4th at 733-35 ("Plaintiffs' likelihood of success on the merits lightens the Executive's stated interests"); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) ("'[t]here is generally no public interest in the perpetuation of unlawful agency action'" (citation omitted)); *Luokung Tech. Corp.*, 538 F. Supp. 3d at 195.  Indeed, "the public has a strong interest in 'preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *Huisha-Huisha*, 27 F.4th at 734 (quoting *Nken*, 556 U.S. at 436).    And fundamentally, the public maintains a strong interest in avoiding overbroad and vague invocations of the AEA that reach outside its scope and history to curtail the most the most basic liberties of the population.  *See Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020).

## III.    The Scope Of The District Court's Temporary Restraining Order Was Proper.

Defendants criticize the scope of the temporary restraining order. But a nationwide injunction is proper where the District Court provisionally certified a class.  *See Trump v. CASA, Inc.*, 24A884, Gov't's App. for Partial Stay of Inj. 38

(Mar 13, 2025) (arguing that class certification and class-wide preliminary relief "unlike the issuance of nationwide injunctions, complies with Article III and respects limits on courts' equitable authority"). Defendants' citation to *Department of State v. AIDS Vaccine Advocacy Coalition*, No. 24A831 (2025), is inapposite, as that case was not a class action. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 485324, at *1 (D.D.C. Feb. 13, 2025).

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' emergency motion to stay the temporary restraining order.

Dated: March 18, 2025                   Respectfully Submitted,

Cody Wofsy                              */s/ Lee Gelernt*
Noelle Smith                            Lee Gelernt
Oscar Sarabia Roman                     Daniel Galindo
AMERICAN CIVIL LIBERTIES                Ashley Gorski
UNION FOUNDATION                        Patrick Toomey
425 California Street, Suite 700        Omar C. Jadwat
San Francisco, CA 94104                 Sidra Mahfooz
(415) 343-0770                          Hina Shamsi
cwofsy@aclu.org                         AMERICAN CIVIL LIBERTIES
nsmith@aclu.org                         UNION FOUNDATION
osarabia@aclu.org                       125 Broad Street, 18th Floor
                                        New York, NY 10004
Arthur B. Spitzer                       (212) 549-2660
Scott Michelman                         lgelernt@aclu.org
AMERICAN CIVIL LIBERTIES                dgalindo@aclu.org
UNION FOUNDATION OF                     agorski@aclu.org

THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Somil B. Trivedi
Bradley Girard
Michael Waldman
Sarah Rich
Skye Perryman
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org

ptoomey@aclu.org
ojadwat@aclu.org
smahfooz@aclu.org
hshamsi@aclu.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the limitation set forth in Federal Rules of Appellate Procedure 27(d)(2)(A) because it contains 7750 words, exclusive of the portions of the brief that are exempted by Rule 32(f). I certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Lee Gelernt*
Lee Gelernt
March 18, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 18. 2025, I electronically filed the foregoing Brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ *Lee Gelernt*
Lee Gelernt
March 18, 2025