Oral Argument Not Yet Scheduled

Nos. 25-5067 & 25-5068

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as President of the United
States, *et al.*,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

## REPLY IN SUPORT OF EMERGENCY MOTION
## FOR A STAY PENDING APPEAL

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
    Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

PATRICK GLEN
Senior Litigation Counsel

## INTRODUCTION

The district court's hasty order enjoining—on a nationwide basis—the President's invocation of the Alien Enemies Act ("AEA") against a designated foreign terrorist organization linked to the Venezuela government represents an extraordinary intrusion upon the President's constitutional and statutory authority to protect the Nation from alien enemies. Moreover, as the Government has explained in additional filings and as this Court is undoubtedly aware, the district court is continuing to attempt to pry sensitive information from the Government. All of the district court's orders should be stayed, and the Executive Branch's standing as a coequal branch of Government should be respected.

Most fundamentally, the district court lacked jurisdiction to issue this highly irregular nationwide injunction. This Court has long held that the President's AEA authority is not subject to judicial review. The only exception is that individuals who are detained under the AEA may challenge the legality of custody in habeas—yet Plaintiffs here intentionally waived their habeas claims, and there is no such thing as a habeas "class action" that would support universal nationwide relief.

Even if a court could review the Proclamation, it expressly makes the two findings that the AEA require: (1) Tren de Aragua (TdA) is both linked to the Venezuelan government and operates as a government unto itself in parts of Venezuelan territory, and that (2) it has engaged in an "invasion" or "predatory

incursion" into our country.  There is no basis for a court to look behind those factual determinations.  And, far from being novel, the President's invocation of the Act in these circumstances is consistent with a long history of using war authorities against groups and entities that are connected to foreign states.

Merits aside, the equities strongly favor the government, given the manfiest harms to the public from letting dangerous alien members of a foreign terrorist organization remain in the country.  The injunction also impairs the constitutional order, by interfering with the President's inherent and statutory powers to conduct foreign relations and protect the Nation from harm and the grave intrusions upon the statutory and inherent Article II powers of the President.  Indeed, the court's order is already undermining the credibility with international partners in Central America with whom the President engaged in high-stakes diplomacy, and it threatens to jeopardize delicate foreign affairs negotiations with law enforcement partners.

For all these reasons, this Court should stay the district court's sweeping and improper interference with the President's exercise of his authorities under Article II and the AEA.

## ARGUMENT

### I.    The Orders Below Are Appealable

As the government explained, Mot. 7–10, the district court's unusual orders, while styled as TROs, are appealable under 28 U.S.C. § 1292(a).  Plaintiffs argue

that the nationwide halt in the President's expulsion of dangerous terrorists is brief, so appellate review can wait. Opp. 6. That is wrong.

Even the orders' temporary period of restraint has caused (and continues to case) serious foreign policy harms that cannot be remedied. The district court has threatened to scuttle carefully organized removal operations that involved sensitive negotiations with multiple foreign partners. And the court is continuing to pursue intrusive inquiries that could hamper negotiations in the future. This diplomacy is already fraught given the TdA's dangerous nature, designation as a foreign terrorist organization, and links to a hostile regime. (Indeed, the challenges involved effectively caused the prior Administration to abandon efforts to remove these dangerous individuals). The court's orders undermine these efforts further, in a way that cannot readily be repaired even if the government ultimately prevails. *See Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (allowing appeal of a TRO that "commanded an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena"); *cf. United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–43 (1950).

The national security implications also support immediate review. The Court's orders, global in scope, makes further removals of TdA members impossible during this critical period. Even when a person does not pose a threat, removal delayed tends to become removal denied. *Zadvydas v. Davis*, 533 U.S. 678, 696

(2001). That is true *a fortiori* when dealing with some of the most dangerous criminals on Earth. Plaintiffs agree immediate appeal is available from an order removing an alien "to a country where he alleged" he will face harm (Opp. at 7, citing *Belbacha*, 520 F.3d at 458)—but insists the government cannot immediately appeal an order that may make it impossible to transfer *out* of our country highly dangerous individuals who are dedicated to causing harm to the American people. That cannot be right.

For these same reasons, even if the Court deems the orders enjoining unappealable, it should nevertheless grant mandamus. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004). Absent appeal, there are "no other adequate means" to protect the President's constitutional and statutory authority to safeguard Americans from the dangerous threats posed by the TdA. *Id.* Further, the Government's "right to issuance of the writ is clear and indisputable," *id.* at 381 (quotation marks omitted), as demonstrated below. And the writ is also "appropriate,"—and necessary—to safeguard the President's prerogative against judicial intrusion. *Id*.

## II.    Plaintiffs Have No Viable Claim.

A challenge to an AEA designation lies in habeas, and there is no other judicial review avenue. First, the challenge is to Presidential action, which cannot be reviewed under the APA. Second, habeas provides the only historic basis for alien

4

enemies to challenge their custody, as recognized by the long line of cases decided under the AEA.

As previously explained, Mot. 8, the district court lacks jurisdiction to review the Proclamation or "enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). That is what the district court purported to do, yet for over a century, courts have held that the President's invocation of his authority under the AEA is "not to be subjected to scrutiny by the courts" even though implemented by others. *Ludecke*, 335 U.S. at 165. The statute vests "[u]nreviewable power in the President." *Citizens Protective League*, 155 F.2d at 294. Accordingly, "[n]o constitutional principle is violated by the lodgment in the President of the power to remove alien enemies without resort or recourse to the courts." *Id.* That is binding circuit precedent.

Unreviewable means *unreviewable*. It leaves no room for APA or nonstatutory judicial review, much less sweeping national injunctions issued without the benefit of any briefing from the government. *Ludecke* expressly held that the AEA "preclude[s] judicial review" under such authorities. *Ludecke*, 335 U.S. at 163–64 ("some statutes 'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute"); *id.* at 164–65 ( "every judge before whom the question has since come has held that the statute barred judicial review"). Indeed, "in cases in which the executive possesses a constitutional or legal discretion, nothing can be more

perfectly clear than that [his] acts are only politically examinable." *Marbury v. Madison*, 1 Cranch 137, 166 (1803).

The only, limited review courts have permitted is in habeas, to challenge whether an individual may be restrained. That is a challenge to the legality of AEA detention, a core habeas claim. *See Ludecke,* 335 U.S. at 163, 173; *see also Johnson v. Eisentrager*, 339 U.S. 763, 774 (1950) ("Executive power over enemy aliens, undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security."); *United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 900 (2d Cir. 1943).

And even Plaintiffs appear to understand that venue is improper in the District of Columbia for such a challenge to detention—they dismissed their detention claims orally in order to avoid the immediate custodian rule, which requires that a challenge to detention be brought in the district of confinement, here Texas. *See* Opp. 19; *Padilla*, 542 U.S. at 435; *Fletcher v. Reilly*, 433 F.3d 867, 875 (D.C. Cir. 2006). But that is the *only* remedy available under the AEA.

And because jurisdiction is limited to habeas claims challenging whether an alien has been properly included in the category of alien enemies—necessarily individual determinations—there is no basis to certify a class to resolve those claims. *See Harris v. Med. Transp.,* 77 F.4th 746, 753 (D.C. Cir. 2023) (class certification inappropriate if "questions of law or fact . . . affecting only individual members"

6

predominate); Compl. ¶¶ 9–13 (setting out separate factual circumstances of each Plaintiff).

The district court also significantly erred in failing to make affirmative findings in writing that Plaintiffs satisfied all the Rule 23 requirements, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345-46 (2011), a requirement the district judge long understood to apply to provisional class certification, until this week. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015).

The cases Plaintiffs cite suggest the district court may review the President's action because they assert their claims fall outside "core habeas" review, are all inapposite. The key problem is this: as *Ludecke* recognizes, the only allowable challenge is a core habeas claim challenging custody under the AEA, so the other theories of review must be rejected. Plaintiffs assert that they "do not seek a release from custody," Opp. 16, but they are seeking exactly that, arguing they cannot lawfully be held under the AEA. Indeed, an initial premise of their suit was a challenge to their detention under the AEA. Compl. ¶¶105-106. And because the only viable cause of action they might have is a habeas challenge to their detention under the AEA, now that they have dropped that claim at the district court's urging, there is no jurisdictional basis whatsoever to hear their claims, let alone outside of the district of their confinement at the time of filing. *Padilla*, 542 U.S. at 435; *Fletcher v. Reilly*, 433 F.3d 867, 875 (D.C. Cir. 2006). The cases Plaintiffs cite by

for the proposition that immigration policy challenges may be brought outside of habeas, Opp. 17–19, arise under the APA to challenge actions of federal agencies, a review path foreclosed here since the challenged action is of the President. *See*, *e.g.*, *Huisha-Huisha*, 27 F.4th 718.[1]  As mentioned above, the President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).  The AEA vests authority in the President, and the President is the one who issued the Proclamation.  There is therefore no avenue under the APA for Plaintiffs to enjoin the President's actions, the Proclamation, or the "power with which Congress vested the President . . . to be executed by him through others." *Ludecke*, 335 U.S. at 166.

In short, outside of limited habeas review, "[t]he control of alien enemies has been held to be a political matter in which the executive and the legislature may exercise an unhampered discretion," and an "alien enemy" otherwise "is not, under the Constitution and the Statute, entitled to any hearing." *Schlueter*, 67 F. Supp. at 565.  Plaintiffs have no remedy other than a habeas petition brought in the district of their confinement.

---

[1] The only case Plaintiffs cite under the AEA (Opp. 17) is this Court's decision in *Citizens Protective League*, but that decision did not discuss the source of its subject matter jurisdiction, predated *Ludecke* and modern guardrails on the exercise of subject matter jurisdiction, and even by its terms declined to review the President's actions.

## III.    The Proclamation Is Lawful

In all events, the government is also likely to succeed on its appeal because the Proclamation and its implementation are lawful.  The AEA grants the President discretion to issue a Proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are found by the President to be met.  *First*, there must be "a declared war," *or* "an[] invasion" *or* a "predatory incursion" that is "perpetrated," *or* "attempted," *or* "threatened against the territory of the United States[.]"  50 U.S.C. § 21.  *Second*, that hostile action must be by a "foreign nation" *or* "government."  *Id.*  The President's Proclamation satisfies both conditions:  TdA is intricately intertwined with the Maduro regime and functions as a government onto itself in parts of Venezuela, while the illegal entry into the United States of its members for hostile reasons is an "invasion" or "predatory incursion."

Plaintiffs' contrary arguments lack merit.  *First*, Plaintiffs cherry-pick definitions of "invasion" and "predatory incursion" to argue that those terms are limited to *military* incursions.  *See* Opp. 20–22.  But there is no *textual* reason to limit the AEA's language is not so limited, and their own proffered definitions are incomplete.  The full definitions in Plaintiffs' preferred dictionaries actually support the government's position.  The full definition of "invasion" includes "[a] hostile entrance into the possessions of another." Webster's Dictionary, "Invasion" (1828). Likewise, "incursion" is defined to include "entering into a territory with hostile

intention." Id. Both definitions *include* military action, but neither is *limited to* such action.

*Second*, Plaintiffs argue the AEA is limited to "foreign sovereigns," or at least actors with a "defined territory" or "common government." Opp. 23–24. But even under this approach, TdA clearly qualifies: as the Proclamation notes, it has *de facto* control over parts of Venezuela in which it operates with impunity as an effective governing authority, *i.e.*, it operates as a "common government" in "defined territory," to use Plaintiffs' formulation. There is no judicial warrant to look behind that presidential finding. In any event, Plaintiffs' approach ignores the reality of the connections between TdA and the Maduro regime. Through its ties to that regime, including its sponsorship by a Vice President and its connection to regime-sponsored Cartel de los Soles, TdA has become virtually indistinguishable from the regime and Plaintiffs offer no compelling rationale for why, given those links, the two cannot be confronted together in exercising authority under the AEA. *See Zivotofsky v. Kerry*, 576 U.S. 1, 15 (2015) (President has the exclusive power to recognize governments).

Plaintiffs' attempts to minimize the history of military action against non-state actors also misses the point. Opp. 23–24. If the United States can attack non-state actors or entities with military force, surely it can take the lesser step of identifying the same hostile forces within U.S. borders and summarily removing them from the country.

10

*Third*, Plaintiffs contend that invocation of the AEA "illegally bypasses" the procedures for removal and relief from removal enacted in the Immigration and Nationality Act. *See* Opp. 24–25. This argument, under which AEA removals could only be exercised if an alien was *also* removable under the INA, would render the AEA superfluous and an effective nullity. Yet the AEA is a key authority that Congress has seen fit to retain because it provides an essential authority to the President to expel foreign threats to the nation. And it is a statute that Presidents Roosevelt and Truman employed *after* enactment of the pre-1952 federal immigration statutes—with those invocations being uniformly upheld by federal courts where jurisdiction to review existed at all. *See N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921) ("A page of history is worth a volume of logic.").

Rather than the AEA being subordinated to the INA, the statutes are *distinct* mechanisms for effectuating the removal of certain aliens, just as this Court has previously recognized that the INA and Title 42 are different bases for excluding aliens from the United States. *See generally Huisha-Huisha*, 27 F.4th 718. There may be points of overlap for the classes covered by the INA and AEA, but there is also divergence, and deciding which Act to apply to any given alien is a matter for the Executive's discretion. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947) (recognizing a harmonious reading of the AEA and pre-INA immigration law).

Similarly, there is no conflict between the INA and the Proclamation's bar on applications for relief and protection. *See* Opp. 24. Enemy aliens are not entitled to seek any relief or protection in the country that has designated them enemies, absent dispensation by the President. *See Citizens Protective League*, 155 F.2d at 294 (noting common law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). Nor does any INA relief or protection provision place fetters on the *President* or his potential exercise of authority under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. §§ 1208.16, 1208.18 (Immigration Judge, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993).

Plaintiffs' claim (Opp. 24–25) that aliens who fall within the purview of the Proclamation must be permitted time to voluntarily depart from the United States is not a defensible reading of the statute, especially in context. To be sure, the statute permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom," 50 U.S.C. § 21, but it also broadly provides that alien enemies within the purview of a Proclamation "*shall* be liable to be . . . removed as alien enemies." In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating

removal, and the AEA's entire purpose would be undercut if invading individuals had to be politely asked to depart on their own terms.

Finally, Plaintiffs' crabbed view of the President's inherent Article II authority does not withstand scrutiny. *See* Opp. 25–26. Plaintiffs fail to meaningfully address the longstanding Supreme Court precedent on the President's expansive authority over foreign affairs, national security, and immigration, *see*, *e.g.*, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936), and the effect that has on the President's authority when coupled with the explicit delegation at issue in this case, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The exercise of authority by the President in this case falls within a long tradition of exercising inherent Article II powers for foreign affairs and national security priorities.

## IV.     The Equities Favor the Government

The balance of harms and the equities strongly favor the government here. *Contra* Opp. 27–29. The district court's orders impede the President from using his constitutional and statutory authority to address a predatory invasion by a hostile group that is harming Americans–and is backed by the Maduro regime, thereby intruding on matters squarely within the executive's purview: national security, foreign affairs, and immigration. *See Humanitarian Law Project*, 561 U.S. at 33–35*; Adams*, 570 F.2d at 954; *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

Therefore, they must be stayed.

Plaintiffs insist that because the district court's orders do not prevent the detention of individuals identified as alien enemies and simply halt "an unlawful practice," the government cannot show irreparable harm. Opp. 28. But the orders undermine delicate international negotiations to remove such dangerous alien enemies, where even a short delay can frustrate the government's efforts entirely. *See* Kozak Decl. Indeed, U.S. foreign policy "*would* suffer harm if the removal of individuals associated with TdA were prevented," given "the significant time and energy expended over several weeks by high-level U.S. government officials and the possibility that foreign interlocutors might change their minds regarding the willingness to accept certain individuals . . . or might otherwise seek to leverage this as an ongoing issue." *Id.* ¶¶ 3–4 (emphasis added). Ccntrary to Plaintiffs' argument that *Zadvydas* does not support the government's position here, the Supreme Court in that case certainly *did* recognize that because circumstances involving terrorism and national security are within the domain of the President, they demand heightened deference. *Zadvydas*, 533 U.S. at 696; *contra* Opp. 29.

Plaintiffs' assertion that the government's position would have "staggering" implications is overblown, Opp. 2, and entirely ignores the fact that individuals identified as alien enemies under the President's Proclamation may challenge that status in a habeas petition, something Plaintiffs here voluntarily withdrew. *See supra*

14

at 6–7.

The district court's orders divest the Executive of its key foreign-affairs and national-security authority oriented towards effectuating removal of alien enemies linked to a designated FTO.  These equities plainly outweigh the equities of permitting aliens linked to a hostile power and a terrorist gang to remain in the United States.  *See, e.g.*, *Nken*, 556 U.S. at 436 (the "public interest in prompt execution of removal orders" "may be heightened" in circumstances where "the alien is particularly dangerous").  U.S. national security is of paramount importance and outweighs any risk of potentially erroneous removal under the AEA, particularly where such individuals may seek relief in habeas.  *Contra* Opp. 28–29.

If nothing else, this Court should stay the court's sweeping universal injunction premised on provisional certification of a nationwide class.  AEA jurisprudence limiting the courts to habeas review sharply contrasts with the universal TRO the district court issued with respect to the members of the provisionally certified class with no habeas claims before the Court.  Precedent establishes that the role of the courts with respect to the AEA is only to assess whether a detainee is subject to the AEA proclamation, not to probe the national-security and foreign-policy judgments of the President in issuing the proclamation itself.  *Ludecke*, 335 U.S. at 164 (providing habeas review only of whether detainee was subject to the proclamation); *United States ex rel. Von Heymann v. Watkins*, 159

15

F.2d 650, 652 (2d Cir. 1947) (same); *United States ex rel. Kessler v. Watkins*, 163 F.2d 140, 141 (2d Cir. 1947) (same).  Moreover, habeas jurisdiction must reach the custodian, *see Rasul v. Bush*, 542 U.S. 466, 483–84 (2004), but here the district court issued a nationwide injunction where most—if not all—of the provisional class members are beyond this Court's jurisdiction.  That was improper.

The highly truncated class procedures here—in which a nationwide class was certified before the government could even file a brief in opposition—were improper too, and incompatible with "'foundational' limits on equitable jurisdiction." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, 756 (2025) (Alito, J., dissenting) (citation omitted).  The injunction undermines longstanding deference to the Executive Branch's national security judgments, including the President's responsibility to identify and respond to threats posed by the TdA.  Moreover, Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021), much less empower them to assume a position of authority over the governmental acts of another coequal department, "an authority which plainly [courts] do not possess." *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923).  To the contrary, courts have recognized the Judiciary's limitations in assessing national-security information and judging the necessity of action to counter national-security threats.  *See Humanitarian Law Project*, 561 U.S at 34 ("[W]hen it comes to

16

collecting evidence and drawing factual inferences in [the national security] area, the lack of competence on the part of the courts is marked").

## CONCLUSION

For all of these reasons, the Court should stay all the district court's orders pending appeal.

Dated: March 19, 2025                  Respectfully submitted,

PAMELA J. BONDI                        AUGUST E. FLENTJE
U.S. Attorney General                  Acting Director

TODD BLANCHE                           EREZ REUVENI
Deputy Attorney General                Assistant Director

EMIL BOVE                              BRIAN C. WARD
Principal Associate Deputy             Acting Assistant Director
    Attorney General

CHAD MIZELLE                           CHRISTINA P. GREER
Acting Associate Attorney General      Senior Litigation Counsel

YAAKOV M. ROTH                         PATRICK GLEN
Acting Assistant Attorney General      Senior Litigation Counsel

By: /s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

                                       *Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 3887 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

*/s/ August E. Flentje*
AUGUST E. FLENTJE

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ August E. Flentje*
AUGUST E. FLENTJE