ORAL ARGUMENT MARCH 24, 2025
Case Nos. 25-5067 & 25-5068

# United States Court of Appeals
# For the District of Columbia Circuit

J.G.G., et al.,
Plaintiffs-Appellees,
v.
Donald J. Trump, et al.,
Defendants-Appellants.

On Appeal from the United States District Court

for the District of Columbia

No. 1:25-cv-766

**BRIEF OF AMICI CURIAE STATE DEMOCRACY DEFENDERS FUND AND FORMER GOVERNMENT OFFICIALS IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTIONS FOR STAY PENDING APPEAL**

Norman L. Eisen
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE,
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... 2

INTRODUCTION AND STATEMENT OF INTEREST ............................................... 4

ARGUMENT .......................................................................................................... 7

    I.    The Executive Branch's invocation of the Alien Enemies Act is subject to judicial review to determine whether the President is exceeding his authority. ................................................. 9

    II.    President Trump's proclamation is unprecedented and dangerous. .............................. 11

CONCLUSION ..................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Loper Bright Enters. v. Raimond,*
    603 U.S. 36985 (2024)...................................................................................5

*Citizens Protective League v. Clark,*
    155 F.2d 2 294 (D.C. Cir. 1946) .. ...............................................................6, 7

*Ex parte Milligan*,
    71 U.S. 2 (1866)..............................................................................................4

*Gordon v. Holder,*
    721 F.3d 63853 (D.C. Cir. 2013) ...................................................................4

*Korematsu v. United States,*
    323 U.S. 214 (1944).......................................................................................8

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)............................................................................4

*Lockington v. Smith,*
    15 F. Cas. 75860 (C.C.D. Pa. 1817) ..............................................................6

*Marbury v. Madison*,
    5 U.S. 13777 (1803)....................................................................................5, 8

*Mochizuki v. United States*, 43 Fed. Cl. 97 (Fed. Cl. 1999)…………………………11

*Ludecke v. Watkins*,
    335 U.S. 160 (1948).....................................................................................5, 6

*Trump v. Hawaii,*
    585 U.S. 667 (2018).......................................................................................8

*United States v. Lee*,
    106 U.S. 196 (1882)......................................................................................4

*U.S. ex. rel. Kessler v. Watkins*, 163 F.2d 140 (2d Cir. 1947) ..............................10

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)....................................................................................10

**Statutes**

8 U.S.C. § 1101 ........................................................................................................2

50 U.S.C. § 21 ...............................................................................................1, 2, 5, 6

**Rules**

Fed. R. App. P. 29(a)(4)(E).....................................................................................1

Fed. R. App. P. 29(a)(5) .........................................................................................12

Fed. R. App. P. 32(a)(5) .........................................................................................12

**Administrative and Executive Materials**

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ....................................3

Exec. Order No. 14167, 90 Fed. Reg. 8613 (Jan. 30, 2025) ....................................3

**Other Materials**

"The Report of 1800, [7 January] 1800," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-17-02-0202...... n.5

**INTRODUCTION AND STATEMENT OF INTEREST**

State Democracy Defenders Fund ("SDDF") is a bipartisan, nonprofit organization committed to upholding the rule of law and defending the Constitution. The other *amici* on this brief (collectively with SDDF, "*Amici*") are conservative or independent former government officials, including those who were elected as Republicans or served in Republican administrations. They share a commitment to limited government, the rule of law, and protecting American citizens and residents from government overreach, particularly when that overreach threatens our freedoms and liberty.[1] They write to express their deep concern over the potential use of an act which gives extraordinary powers to the Executive Branch during wartime when the United States is not at war. The implications of such use are extraordinary and dangerous.

Congress enacted the Alien Enemies Act ("AEA" or "Act"), 50 U.S.C. § 21, in 1798, when the United States was on the brink of war with France. *Alien and Sedition Acts (1798)*, Nat'l Archives, https://www.archives.gov/milestone-documents/alien-and-sedition-acts ("*Alien and Sedition Acts*"). The law grants the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* affirm that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than *Amici* or their counsel contributed money that was intended to fund the preparation or submission of this brief.

President extraordinary powers in the event of a "declared war" or of an "invasion or predatory incursion perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." 50 U.S.C. § 21. Those powers include immediate detention and removal of any individuals who are "natives, citizens, denizens, or subjects of the hostile nation or government." *Id.* The AEA has only ever been invoked during the War of 1812 and the First and Second World Wars, each an instance of congressionally declared war against or "invasion or predatory incursion ... threatened ... by" a foreign nation. *Id.*

The United States is neither at war nor under threat of foreign invasion, but President Trump nonetheless issued a proclamation on March 15, 2025, purporting to invoke the AEA. *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua*, The White House (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/. The proclamation declared that Tren de Aragua ("TdA"), a Venezuelan gang, is a "hybrid criminal state" "threatening an invasion or predatory incursion" against the United States. Overstepping his authority, the President has now removed some 250 people from the United States in disregard of the AEA's limitations on his authority.

*Amici* agree with Plaintiffs that the removal actions taken or threatened against them "violat[e] the limits set by, Congress" in the AEA and the Immigration and

5

Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 *et seq*. Dkt. No. 1208721185 (Pls. Resp. to Mot.), at 15, 24. *Amici* further agree that the President's actions are subject to judicial review. *Id.* at 8–9. *Amici* write to emphasize how the Government's abuse of the AEA and its attempt to evade judicial review contravene the public interest and warrant denying a stay of the Temporary Restraining Order issued by the district court below.

Since starting his second term, the President has referred to illegal immigration as an "invasion."[2] If the President is allowed to use the AEA to summarily deport individuals allegedly associated with TdA, he could presumably do the same for immigrants from any country that the President believes does not do enough to prevent its citizens from migrating to the United States. While *Amici* recognize the need to enforce our immigration laws, including against criminal noncitizens, our constitutional system does not allow the President to disregard limits that Congress imposes on the Executive Branch or bypass due process.

As former public officials, *Amici* pledged to support the Constitution's demands for the separation of powers and the rule of law. Our government— including the President and the Executive Branch—is bound by the rule of law. Despite the President's proclamation of March 15, the United States is not currently

---

[2] *See, e.g.*, *Protecting the American People Against Invasion*, Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025); *Clarifying the Military's Role in Protecting the Territorial Integrity of the United States*, Exec. Order No. 14167, 90 Fed. Reg. 8613 (Jan. 30, 2025).

6

at war with any foreign nation, no foreign nation is invading or threatens to invade our borders, and the President's invocation of supposedly unreviewable statutory authority lacks all merit. No person should have been detained or removed under that proclamation and those that were should have been—and now must be—afforded due process and individualized consideration. Anything less countenances oppression, abuse, and tyranny.

## ARGUMENT

The Court should deny the relief sought by the Government because there is no public interest in the perpetuation of unlawful executive action. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). It makes no difference that President Trump has invoked national security interests: under our constitutional order, "[l]iberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008).[3] The President's pretextual invocation of the AEA to unlawfully remove individuals from

---

[3] *See also Ex parte Milligan*, 71 U.S. 2, 120–21 (1866) ("The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.").

7

the country manifestly harms the public interest by violating that "framework of the law" and our constitutional order.[4]

In the AEA, Congress authorized the President to detain or remove individuals only when: (1) there is a "declared war" or "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States"; (2) any such "invasion or predatory incursion" must be made by a "foreign nation or government"; and (3) the President makes a "public proclamation of the event." 50 U.S.C. § 21. Here, the President has made a proclamation, but there has been no "event" to proclaim. Congress has not declared war. Putting aside whether entry of TdA members into the United States over time is really an "invasion," no such "invasion" is by a foreign nation or government.[5] The President's attempt to wield the Act absent these elements must be subject to review, as "[i]t is emphatically the province and duty of the Judicial Department"—not the Executive—"to say what the law is" and how it may be executed. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). We urge the Court to deny the government's request for a stay and await any appeal of an appealable order.

---

[4] *See United States v. Lee*, 106 U.S. 196, 220 (1882) ("All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.").

[5] James Madison, in discussing the Alien and Sedition Acts of 1798, wrote that "[i]nvasion is an operation of war." "The Report of 1800, [7 January] 1800," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-17-02-0202.

8

## I. The Executive Branch's invocation of the Alien Enemies Act is subject to judicial review to determine whether the President is exceeding his authority.

Where the AEA's elements are met, the President may detain subject individuals and, consistent with other applicable law, remove them from the United States. But while the scope of executive discretion under the Act is "as unlimited as the legislature could make it," *Ludecke v. Watkins*, 335 U.S. 160, 164 (1948) (quoting *Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817)), it is necessarily subject to judicial review.

The AEA does not grant the President authority to remove anyone from the country absent "a declared war" against, or an "invasion or predatory incursion" by, a nation or government. 50 U.S.C. § 21. Judicial review is necessary to determine if these threshold conditions are met, and courts have consistently asserted jurisdiction to do so. Both the Supreme Court and this Court have stated that whether a person is an "alien enemy" under the AEA is reviewable. *Ludecke*, 335 U.S. at 172 n.17 ("[W]hether the person restrained is in fact an alien enemy fourteen years of age or older may also be reviewed by the courts."); *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946) ("[W]hether the individual involved is or is not an alien enemy, is admitted by the Attorney General to be open to judicial determination."). Furthermore, the Supreme Court has affirmed that the bases for the President's invocation of the AEA are reviewable. *See Ludecke*, 335 U.S. at 171

9

("[R]esort to the courts may be had . . . to question the existence of the 'declared war' . . . ."); *U.S. ex. rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (interpreting meaning of "foreign nation or government"). This threshold condition was obvious in all past instances where the AEA has been asserted—during the War of 1812 and the First and Second World Wars, all of which were declared by Congress and plainly occurring. That is not the case here.

This Court's jurisprudence regarding the constitutionality of the AEA has emphasized that the Act is grounded in the war powers of Congress and the President. *See Citizens Protective League*, 155 F.2d at 294 (emphasizing that the AEA grants removal authority "in time of war," under the "necessities of the power to wage war successfully," to undertake the "conduct of war," and through the "responsibility of war-making" vested by the Constitution in Congress and the Executive). But no war with or invasion by Venezuela exists, and the President's unilateral determination that TdA is a "hybrid criminal state" that has "invaded" the United States is dubious, at best, and subject to judicial review. *See* Charlie Savage & Julian E. Barnes, *Intelligence Assessment Said to Contradict Trump on Venezuelan Gang*, N.Y. Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/us/politics/intelligence-trump-venezuelan-gang-alien-enemies.html. In the meantime, the public has no interest in the misuse

of wartime powers to secure a presidential blank check to summarily remove foreign nationals.

## II. President Trump's proclamation is unprecedented and dangerous.

The Alien Enemies Act has been abused before, even during a time of war: the AEA was last invoked during World War II and used to detain tens of thousands of individuals of Japanese, German and Italian descent in internment camps on the basis of alleged national security interests. This abuse of power, conducted "solely and explicitly on the basis of race," was "objectively unlawful and outside the scope of Presidential authority," and "has no place in law under the Constitution." *Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (abrogating *Korematsu v. United States*, 323 U.S. 214 (1944). It led to widespread condemnation, apologies from Congress and presidents, and reparations. *See e.g*, *Mochizuki v. United States*, 43 Fed. Cl. 97 (Fed. Cl. 1999) ("The statute enacted by the Congress to compensate Americans of Japanese descent was not perfect, however it was a highly moral action. It was an attempt to right a wrong. As such it marks an important milestone in the long road toward decent and civilized life.") The current administration's attempt to take analogous action under the AEA must be enjoined pending appeal to prevent a similar catastrophe.

As former government officials, *Amici* recognize the need to control our borders and enforce our immigration laws, up to and including removal of

11

individuals who have violated our laws. But such consequences must themselves be delivered lawfully. The Administration claims it is using the AEA solely to remove TdA gang members and, to be clear, we have no sympathy for those who are members of any dangerous gang. When they cross our borders illegally or otherwise commit criminal acts, they should be arrested and removed. But existing laws, including the INA, already provide for those actions. While there may be frustration with the pace of those actions, a policy that enables indefinite detention or summary removal without judicial process or statutory authority is a direct affront to our "government of laws, and not of men." *Marbury*, 5 U.S. at 163.

Furthermore, the implications of the Trump Administration's use of the Act are much broader than merely fast-tracking the deportation of unsympathetic criminals. First, Congress gave the President extraordinary powers under the AEA precisely because they were thought to be necessary during a time of war. But we are not at war, nor has any foreign government, including Venezuela, invaded the United States. Allowing the President to simply declare an "invasion" and then summarily and in darkness arrest, detain, and remove any individual who happens to be from or connected to a particular country from which other migrants depart and then cross our border, even illegally, would be shocking.

Second, and not surprisingly, there are already reports that Venezuelans who do not have any connection to TdA have been removed under the AEA. Jazmine

Ulloa & Zolan Kanno-Youngs, *Trump Officials Say Deportees Were Gang Members. Few Details Were Disclosed.*, *N.Y. Times* (Mar. 18, 2025) https://www.nytimes.com/2025/03/18/us/trump-deportations-venezuela-gang.html.

The Government insists that it has no obligation under the AEA to present evidence of gang membership, nor is there opportunity for a judge to review such evidence.[6] That is an affront to the AEA's text and the rule of law.

The AEA was never intended as a broad immigration enforcement tool, yet the Administration now argues it applies to Venezuelans en masse, based on an unreviewed and sweeping proclamation about a gang from Venezuela. If the Court allows the Executive to designate foreign nationals as enemy aliens without judicial oversight, the precedent is dangerously clear: unchecked power to remove the enemy of the day. The Administration could wield the AEA to detain or remove immigrants from Middle Eastern countries by alleging (without evidence) ties to non-government terrorist groups. It could detain or remove immigrants from Mexico by alleging (again without evidence) affiliation with a drug cartel. The Supreme Court has consistently rejected such unchecked executive power, and *Amici* urge this Court to do the same. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 596 (1952) ("To deny inquiry into the President's power in a case like this, because

---

[6] Indicative of the misapplication of the Act to an "invasion" by a gang, as opposed to a foreign nation, is the difficulty of determining gang membership, as opposed to national status. The Act simply should not apply here.

13

of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into challenged power….").

As conservatives, *Amici* espouse certain bedrock principles, including the rule of law, limited government, and protecting individual freedoms and liberties. The Government's use of the AEA outside of wartime to advance domestic and foreign policy goals violates those principles at their core and is ripe for further and greater abuse. It sets a dangerous course of unchecked Presidential power that will endanger the liberties of every person in the United States.

## CONCLUSION

This Court should deny Defendants-Appellants' motion to stay the district court's Temporary Restraining Order pending appeal.

Date: March 22, 2025                                                 Respectfully Submitted,

*[signature: Norman L. Eisen]*

_____
Norman L. Eisen
Stephen A. Jonas
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE,
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Steve@statedemocracydefenders.org
*Counsel for Amici*

14

*/s/ Stuart M. Gerson*  
Stuart M. Gerson  
**EPSTEIN BECKER GREEN**  
1227 25th Street NW,  
Suite 700  
Washington, DC 20037  
Tel: (202) 861-4180  
SGerson@ebglaw.com  
*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because it contains 2596 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1). This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

_____
Norman L. Eisen

**CERTIFICATE OF SERVICE**

I certify that on March 22, 2025, I caused this document to be electronically filed with the Clerk of Court using this Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

_____
Norman L. Eisen